**15-1653 (L)**
*Chai v. Commissioner*

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

————————

August Term, 2016

(Argued: October 25, 2016          Decided: March 20, 2017)

Docket Nos. 15-1653 (L); 15-2414 (XAP)

————————

JASON CHAI,

*Petitioner-Appellant-
Cross-Appellee*,

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee-
Cross-Appellant*.

————————

Before:

KATZMANN, *Chief Judge*, WESLEY and CARNEY, *Circuit Judges*.

————————

These cross appeals from orders of the United States Tax Court relate to taxpayer Jason Chai's underreporting of income in his 2003 tax return, principally in connection with a $2 million payment Chai received for his role in a now-defunct tax-shelter scheme. The Commissioner of Internal Revenue (the "Commissioner") issued Chai a notice of deficiency for failing to pay self-employment tax on the payment. Chai petitioned the Tax Court for redetermination of that deficiency. While that deficiency proceeding was pending, and before the Tax Court had determined the proper treatment of the $2 million payment, partnership losses (for an unrelated partnership of which Chai was a partner) were disallowed in a separate partnership tax proceeding. The Commissioner thereafter asserted by amended answer in Chai's personal deficiency proceeding an income-tax deficiency attributable to the $2 million payment, in addition to the self-employment-tax deficiency, now that Chai's partnership losses had been disallowed. The Tax Court ultimately sustained the self-employment tax deficiency and related penalty, but dismissed for lack of jurisdiction the Commissioner's later-asserted income-tax deficiency. In upholding the penalty assessment, the Tax Court rejected as untimely Chai's argument, raised for the first time in post-trial briefing, that the Commissioner failed to carry his burden to show compliance by the Internal Revenue Service with a written supervisory approval requirement imposed by statute. Chai challenges the ruling upholding his self-employment-tax deficiency and the Tax Court's refusal to consider his post-trial sufficiency challenge with respect to the penalty,

and the Commissioner challenges the Tax Court's jurisdictional ruling with respect to the income-tax deficiency. AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, and REMANDED.

JEREMY KLAUSNER (Frank Agostino, Lawrence M. Brody, *on the brief*), Agostino & Associates, P.C., Hackensack, NJ, for *Petitioner-Appellant-Cross-Appellee*.

ARTHUR T. CATTERALL, Attorney, Tax Division, Department of Justice (Richard Farber, *on the brief*), *for* Catherine D. Ciraolo, Acting Assistant Attorney General, Washington, D.C., *for Respondent-Appellee-Cross-Appellant*.

———————

WESLEY, *Circuit Judge*:

Taxpayer Jason Chai's appeal and the Commissioner of Internal Revenue's (the "Commissioner") cross-appeal relate to Chai's underreporting of income in his 2003 tax return, principally in connection with a $2 million payment Chai received from Delta Currency Trading, LLC ("Delta") for his role in a now-defunct tax-shelter scheme. The Commissioner issued Chai a timely notice of deficiency asserting that he owed self-employment tax on the $2 million payment, plus a 20% accuracy-related penalty. The

original notice of deficiency did not assert an income-tax deficiency because the $2 million increase in Chai's income was initially offset for income-tax purposes (but not self-employment-tax purposes) by his reported share of a partnership loss that could be adjusted only in a separate, partnership-level proceeding. Chai initiated a deficiency proceeding in the United States Tax Court to challenge the Commissioner's self-employment-tax determination.

While Chai's deficiency proceeding was pending, losses reported by Mercato Global Opportunities Fund, LP ("Mercato")—a partnership of which Chai was a member—were disallowed in a partnership tax proceeding (the "*Mercato* proceeding"). Chai had reported his share of Mercato's losses on his 2003 personal return. With that loss disallowed, Chai would also owe income tax on the $2 million payment if the Tax Court decided that the payment was income. To collect that tax (and another 20% accuracy penalty), the Commissioner filed an amended answer in Chai's personal deficiency proceeding to assert an income-tax deficiency in addition to the original self-employment-tax deficiency. In separate orders, the Tax Court held (1) it lacked jurisdiction over the added income-tax deficiency because I.R.C. § 6230 required the Commissioner to apply the results of the *Mercato* proceeding to Chai by computational adjustment, rather than in  his deficiency proceeding, and (2) Chai owed the self-employment tax and corresponding penalty. In upholding the penalty assessment, the Tax Court rejected as untimely Chai's argument, raised for the first time in post-trial briefing, that the Commissioner failed to carry its burden to show

4

compliance with a statutory written-approval requirement. The Commissioner challenges the first ruling, and Chai challenges the second.[1]

For the reasons discussed below, we hereby: (1) **VACATE** the Tax Court's jurisdictional ruling and, because Chai concedes that the $2 million payment is fully taxable, **REMAND** the case to the Tax Court to enter a revised decision upholding the income-tax deficiency; (2) **AFFIRM** the portion of the Tax Court's order upholding the self-employment-tax deficiency; and (3) **REVERSE** the portion of the Tax Court's order upholding the accuracy-related penalty.

---

[1] The numbers involved in this litigation are as follows. On his 2003 tax return, Chai reported an overall loss of $11.47 million and income tax of $0. Most of the loss—$11.15 million—was due to Chai's participation in the Mercato partnership. When the IRS audited Chai's 2003 return, it adjusted his income upwards by $2.4 million, largely due to the $2 million Delta payment. This still left a loss of approximately $9.1 million. The IRS's first notice of deficiency therefore asserted a $63,751 self-employment tax deficiency and a $12,750.20 accuracy-related penalty. When the *Mercato* proceeding concluded and the partnership loss was disallowed, Chai's income was no longer sheltered by the partnership losses. Not including the Delta payment, this brought Chai's 2003 income to $49,869, for which the IRS issued a computational adjustment for $10,269 in income tax and a $2,053.80 penalty. Including the disputed Delta payment, this would put his 2003 income just above $2 million, for which the IRS asserted in its First Amendment to Answer (defined *infra*) an income tax deficiency of $563,868.

5

## BACKGROUND

### I. STATUTORY FRAMEWORK

This case involves the complicated intersection of partnership and individual taxpayer tax court proceedings. Before turning to the facts and procedural background of this case, both of which are encumbered with terminology and concepts that have confounded the parties and the Tax Court, it is helpful to start with a basic outline of the statutory context underlying this case.

When the Internal Revenue Service (the "IRS") audits an individual taxpayer's return and determines that he owes more than he reported, it must follow statutorily prescribed deficiency procedures to recover unpaid tax, including unpaid self-employment tax imposed by I.R.C. § 1401(a), as well as any applicable reporting penalty. *See* I.R.C. §§ 6211-6216, 6665(a)(1). Those procedures require the IRS to assert its claim for additional tax and penalty through a notice of deficiency, which the taxpayer may challenge by petition filed in the Tax Court within 90 days of the notice's issuance. *See* I.R.C. §§ 6212(a), 6213(a).

The Tax Court "exercises jurisdiction only to the extent provided by statute." *See GAF Corp. v. Comm'r*, 114 T.C. 519, 521 (2000). Its jurisdiction to redetermine a deficiency asserted by the IRS "depends upon a valid notice of deficiency and a timely filed petition." *Id.*; *see Moretti v. Comm'r*, 77 F.3d 637, 642 (2d Cir. 1996) ("A notice of deficiency is . . . considered the jurisdictional prerequisite to a taxpayer's suit in the Tax Court for redetermination of his tax liability." (internal quotation marks omitted)). Where

the notice of deficiency is invalid, the Tax Court must dismiss the case. *See GAF Corp.*, 114 T.C. at 528.

The IRS is prohibited from assessing and collecting additional tax deficiencies during the period for filing a Tax Court petition. If the taxpayer timely files, that prohibition remains in place until the decision of the Tax Court becomes final. I.R.C. § 6213(a). Along the same lines, the statute of limitations on the assessment of any additional deficiencies is tolled during that period and for 60 days thereafter. I.R.C. § 6503(a)(1).

Unlike individuals and corporations, partnerships are not separately taxable entities. A partnership's income and expenses pass through to the individual partners, who must pay a tax on their proportionate shares of net gain or may claim a deduction for their shares of net loss. Partnership tax is subject to the procedures set forth in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324 (codified as amended at I.R.C. §§ 6221-6234). Central to those procedures is the distinction between partnership and nonpartnership items. "Partnership item[s]" are items more properly determined at the partnership level than at the partner level—e.g., income, gain, loss, deduction, and credit. I.R.C. §§ 6221, 6231(a)(3). "Nonpartnership item[s]" are all of the partnership's remaining income and expenses that are not "partnership item[s]." I.R.C. § 6231(a)(4).

To initiate adjustments to partnership items, TEFRA requires the IRS to conduct a unitary audit of the partnership and issue a final partnership administrative

7

adjustment ("FPAA") to the partners, which the partners may challenge in a single judicial proceeding (a "TEFRA proceeding") in, *inter alia*, the Tax Court. *See* I.R.C. §§ 6223(a)(2), 6226. Adjustments to nonpartnership items follow the standard procedures for adjustments to personal income. *See* I.R.C. §§ 6221, 6230(a)(2)(A). The goal of the TEFRA procedures "is to ensure that, in general, partnership items are adjusted once at the partnership level. All partners, whose tax liability will be affected by its outcome, have the opportunity to participate in the audit allowing each to be bound by its result." *Callaway v. Comm'r*, 231 F.3d 106, 111 (2d Cir. 2000).

As with the deficiency proceedings for nonpartnership (i.e., personal) items, the IRS is prohibited from making FPAA-related deficiency assessments during the period in which a partner may challenge the FPAA and, if a challenge is commenced, until after a final Tax Court decision is issued. I.R.C. § 6225(a). The statute of limitations is likewise tolled during that period and for one year after a final decision. I.R.C. § 6229(d).

Once a partnership-level tax proceeding becomes final (or the time to seek judicial review of the FPAA expires), the IRS applies the results to each partner's personal return and calculates any deficiencies. If the deficiency calculation would be purely computational, the Commissioner issues to the partner a "notice of

computational adjustment,"[2] rather than a notice of deficiency.  I.R.C. § 6225; *see* I.R.C. § 6230(a)(1) ("Except [in certain circumstances], subchapter B of this chapter [i.e., deficiency procedures] shall not apply to the assessment or collection of any computational adjustment.").; *N.C.F. Energy Partners v. Comm'r*, 89 T.C. 741, 744 (1987).  The deficiency procedures, however, do apply to "affected items"[3] that require an individual, partner-level factual determination.[4]  I.R.C. § 6230(a)(2)(A).  In such instances, the IRS is required to issue, within one year of the outcome of the TEFRA proceeding, an affected-item notice of deficiency (unless it can be folded into the partner's

---

[2] I.R.C. § 6230(c)(2)(A). A "computational adjustment" is "the change in the tax liability of a partner which properly reflects the treatment under this subchapter of a partnership item.  All adjustments required to apply the results of a proceeding with respect to a partnership under this subchapter to an indirect partner shall be treated as computational adjustments."  I.R.C. § 6231(a)(6) (internal citations omitted).

[3] An "affected item" is "any item to the extent such item is affected by a partnership item."  I.R.C. § 6231(a)(5).

[4] Section 6230(a)(2) also requires deficiency proceedings for items that have, as a result of the FPAA proceeding, become nonpartnership items.  I.R.C. § 6230(a)(2)(A)(ii).  But everyone agrees that provision is not applicable here, except to the extent it played into the analysis in *Harris v. Commissioner*, 99 T.C. 121 (1992) (addressed below).

existing deficiency proceeding).[5]    I.R.C. §§ 6229(d), 6230(a)(2)(A)(i); Treas. Reg. § 301.6231(a)(6)-1(a)(3).

The TEFRA provisions (and cases interpreting them) are clear: Partnership-level proceedings must be kept distinct from deficiency proceedings involving individual partners. A problem arises, however, where, as here, a partnership's net loss is so large that it offsets proposed adjustments to nonpartnership items in a partner's personal deficiency proceeding. In that case, the loss offset could eliminate some of the partner's personal tax deficiencies (but not others, such as a self-employment-tax deficiency), and the non-TEFRA adjustments could wind up being uncollectible because of the expiration of the statute of limitations vis-à-vis nonpartnership items.

That was the case in *Munro v. Commissioner*, 92 T.C. 71 (1989). There, the IRS presumptively—i.e., prior to the conclusion of ongoing partnership-level TEFRA proceedings—issued a notice of deficiency to each partner that disallowed partnership losses for computation

---

[5] Penalties determined in a partnership proceeding, even if they require a partner-level substantive determination, are excepted from the affected-item notice of deficiency requirement. The penalty is treated as a purely computational matter and not subjected to deficiency proceedings. I.R.C. § 6230(a)(2)(A)(i); *see also* I.R.C. § 6221 (requiring partnership level treatment for partnership items "[e]xcept as otherwise provided"). That is why, in Chai's case, the Commissioner abandoned in the First Amendment to Answer his claim for the additional penalty. Comm'r Br. 17-18 (citing I.R.C. § 6230(a)(2)(A)(i)).

purposes.[6] *Id.* at 72-73. The taxpayers moved to dismiss for lack of jurisdiction, asserting that the deficiency was attributable to partnership-level adjustments subject to ongoing TEFRA proceedings. *Id.* at 73-74. Although the Tax Court agreed that a deficiency existed and that it had jurisdiction, the court rejected the IRS computation. The court held that partnership items included on a taxpayer's return must be "completely ignored [for purposes of] determin[ing] if a deficiency exists that is attributable to nonpartnership items."[7] *Id.* at 74. This became known as the "*Munro* computation."

But *Munro* created its own problems for taxpayers and the IRS. A taxpayer/partner, for example, who is subject to concurrent TEFRA and individual deficiency proceedings could be assessed and required to pay a deficiency that would have to be returned by the IRS as an overpayment if partnership losses were ultimately allowed. The taxpayer would effectively be without a prepayment

---

[6] The IRS asserted a $259,500 adjustment to the Munros' personal combined income-tax liability to account for unclaimed nonpartnership items and added $54,312 more in income tax as a result of the disallowed partnership losses, for a total deficiency of $313,812.

[7] In contrast to the IRS's computation (which disallowed all partnership losses), the Tax Court computed the deficiency attributable to the $259,500 nonpartnership income adjustment to be the difference between the tax on the Munros' reported nonpartnership income ($454,895) and the tax on their adjusted nonpartnership income ($714,485).

11

forum to litigate the partnership item adjustments. The IRS similarly would be unable to adjust various nonpartnership deductions where a taxpayer derives income primarily from a partnership, because the income would have to be ignored under *Munro*. Thus, in 1997, Congress created a procedure—codified at I.R.C. § 6234—to deal with *Munro*-like situations. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1231(a), 111 Stat. 788, 1020-23, *amended by* Job Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, § 416(d)(1)(D), 116 Stat. 21, 55.

Section 6234 is a helpful method for coordinating deficiency and TEFRA proceedings to avoid the taxpayer losing out on prepayment rights and the IRS losing its ability to assess deficiencies attributable to partnership items. It provides a declaratory judgment procedure for adjustments to an oversheltered tax return—that is, a return that shows no taxable income and a net loss from a TEFRA partnership proceeding. I.R.C. § 6234(b). In such an instance, the IRS may issue a "notice of adjustment" for nonpartnership items if "the adjustments resulting from such determination do not give rise to a deficiency (as defined in section 6211) but would give rise to a deficiency if there were no net loss from partnership items."[8] I.R.C.

---

[8] Take, for example, a taxpayer/partner who files an oversheltered return, reporting $500,000 of income and $1 million of losses (all of which are partnership items). If the IRS determines that the taxpayer/partner underreported his income by $300,000, then the taxpayer/partner's adjusted income, namely, $800,000, would not give rise to a deficiency, because his

12

§ 6234(a)(3). The taxpayer may challenge the notice of adjustment within 90 days in the Tax Court, which has jurisdiction to determine the correctness of the adjustment. I.R.C. § 6234(c). If the Tax Court's decision is upheld (or not contested) and the taxpayer's partnership items are ultimately adjusted in a subsequent TEFRA proceeding, the IRS may collect any additional deficiency attributable to nonpartnership items. If the TEFRA proceedings conclude before the Tax Court makes a declaration, the notice of adjustment is treated as a notice of deficiency. I.R.C. § 6234(g)(3). Finally, if the taxpayer does not contest the notice within the period to do so, the taxpayer may seek a refund upon conclusion of the TEFRA proceeding for any deficiencies attributable to partnership items that were ultimately upheld. I.R.C. § 6234(d).

With that baseline in mind, we turn to the facts of this case.

## II.   THE TAX-SHELTER SCHEME AND CHAI'S ROLE AS ACCOMMODATING PARTY[9]

Chai is a Harvard-trained architect who got involved in a substantial tax-shelter scheme at the urging of Andrew Beer, after Beer married Chai's cousin. Central to the self-

---

partnership losses would still exceed his income, but would give rise to a deficiency if the partnership losses were disallowed. In such instance, § 6234 would be appropriate.

[9] Unless otherwise noted, the undisputed facts in this section are taken from the Tax Court opinion appealed from. *See* App'x 232-64.

employment tax inquiry is Chai's relationship to Beer and role in the various tax shelters.

Beer is an investment manager who "created and marketed several tax shelters directed to wealthy individuals" in 2000 and 2001. App'x 234. The goal was to reduce the substantial tax liabilities of prospective clients by generating losses to offset taxable income for a particular year. Among the entities Beer formed to market and advise the tax shelters were Bricolage Capital, LLC ("Bricolage"), Counterpoint Capital, LLC ("Counterpoint"), and Delta Currency Trading, LLC ("Delta"). At all relevant times, Beer owned all or a majority of the interests in Delta, Bricolage, and Counterpoint (collectively, the "Bricolage entities"). Chai never owned an interest in Delta or Bricolage. The Bricolage entities shared clients, offices, employees and resources.

For their services, the Bricolage entities (and particularly Beer as majority owner) collected sizable advisory and client-facilitation fees. The shelters shared three characteristics: (1) each involved a flow-through entity ("FTE"); (2) to garner the tax benefits, the FTEs entered into "straddle" transactions by which gains would be triggered before the participant entered the shelter and losses would be triggered thereafter, leaving the participant with an interest in only the losses; and (3) each required an accommodation (accommodating party)—a transitory partner or shareholder—to serve as initial owner of the straddled gains. This is where Chai came in.

14

In 2000, Beer offered Chai the opportunity to act as an accommodating party in exchange for compensation from the Bricolage entities. Chai agreed to a $100,000 annual salary plus a signing bonus and potential discretionary bonuses. Beer explained to Chai his integral role in the schemes as a conduit and assured Chai that the tax liabilities he incurred in the transactions would be eliminated by later-acquired offsetting losses.

Pursuant to this arrangement, during 2000 and 2001, Chai served as the accommodating party for at least 131 tax shelters and reported over $3.2 billion of shelter-derived income. He received and reported equal offsetting losses during that time. In his capacity as accommodating party, Chai executed numerous transactions and traveled to the offices of Delta and its affiliates "a lot" and "regularly." App'x 238. Due to travel conflicts with his architecture business, however, Chai was often unable to be physically present to sign documents in his capacity as accommodating party. To resolve the problem, Chai formed JJC Trading, LLC ("JJC") in 2001 at Delta's suggestion. Chai was sole owner of JJC and Bricolage was named a nonmember-manager with discretionary and signatory authority.

Chai's friendship with Beer and the resulting business arrangement proved fruitful for Chai. In 2000, for instance, Chai received $1.2 million as a signing bonus from Counterpoint, and in 2001, he received $1 million from Delta. Both entities reported the payments as non-employee compensation (on IRS Form 1099-MISC, Miscellaneous Income), and Chai reported them as income

on his tax returns. Chai also received the agreed-upon $100,000 annual salary from Bricolage and Counterpoint in each of 2001 and 2002.

On his 2001 return, Chai made a series of income-offsetting declarations related to his arrangement with Beer. Chai reported on Schedule C[10]—the form for "Profit or Loss From Business (Sole Proprietorship)"—that he "'materially participate[d]' in the operation of [JJC's] business during 2001," thereby entitling him to favorable treatment under passive-loss rules. Supp. App'x 146. Chai described certain capital losses as "disposition[s] of business property," which, under I.R.C. § 1231, allowed him to treat JJC's losses as ordinary losses. Supp. App'x 160-65. Chai also made a "mark-to-market" election for JJC under I.R.C. § 475(f)—an election limited to persons "engaged in a trade or business as a trader in securities." Supp. App'x 156, 166; *see also* I.R.C. § 475(f)(1)(A)).

By the end of 2001, all of Chai's and JJC's interests in the tax shelters had been liquidated. In April 2002, after Chai received a $1 million payment from Delta, Delta's financial officer, Helen Del Bove, emailed Chai that she

---

[10] The instructions to Schedule C describe various circumstances constituting "material participation," including "participat[ion] in the activity on a regular, continuous, and substantial basis during [the tax year]," provided the participation exceeded 100 hours. 2001 Instructions for Schedule C, Profit or Loss From Business, at C-2; *see* Treas. Reg. § 1.469-5T(a)(7), (b)(2)(iii).

would be "finalizing some numbers within the next week or so" regarding additional fees he would receive from Delta in the future. Supp. App'x 211.

In February 2003, Chai and Del Bove discussed the proper tax treatment of a prospective $2 million payment from Delta to Chai. Del Bove told Chai that she was going to wire him the $436,000 remaining in JJC, dissolve that entity, and pay him another $2 million. Chai asked her how the payments should be treated and whether he would be issued an IRS Form 1099 for the whole amount. Del Bove told him multiple times that the $2 million payment was income and that Delta would report it on his Form 1099 for 2003. Beer subsequently authorized on behalf of Delta a payment of $2 million to Chai as a discretionary bonus. Delta, consistent with Del Bove's guidance, treated the payment as non-employee compensation on Chai's Form 1099 for 2003.

## III.  CHAI'S 2003 RETURN AND RELATED AUDITS

Chai did not report the $2 million payment from Delta as taxable income on his 2003 return. Instead, in filing his return, he took the position that it constituted the return of capital from his investments. Chai, however, was not a partner of, and did not invest any capital in, Delta. And neither Chai nor JJC reported any portion of Delta's income or loss in 2003. No corresponding tax form was prepared by Delta for Chai. Chai's return showed an overall loss of $11,466,070 (with $0 tax), the majority of which ($11,149,621) came from his share of partnership losses claimed by Mercato—a partnership of which Chai

17

was a member and that had no direct connection to the $2 million Delta payment.

The IRS conducted separate, but concurrent, audits of Chai's and Mercato's 2003 returns. The audit of Chai's return resulted in a net increase income adjustment of $2,397,139, primarily due to the unreported $2 million payment from Delta. In its May 5, 2009 notice of deficiency to Chai, the IRS characterized the $2 million Delta payment as self-employment income and therefore asserted a corresponding deficiency in Chai's self-employment tax. At that time, the IRS did not assert a deficiency in Chai's "regular" income tax related to the $2 million payment because it was prohibited from adjusting Chai's $11.1 million share of the Mercato loss prior to the conclusion of the *Mercato* proceedings.

Meanwhile, the audit of Mercato led the IRS to issue, on June 17, 2009, an FPAA that completely disallowed Mercato's $110 million claimed loss.

In separate proceedings over the following years, Chai challenged the notice of deficiency and Mercato challenged the FPAA in the *Mercato* proceedings.

## IV.   THE TAX COURT PROCEEDINGS

Soon after filing an answer in Chai's deficiency proceeding in the Tax Court, the Commissioner concluded that, under *Munro*,[11] he should have included in the May

---

[11] Recall that, in *Munro*, the Tax Court held that where "partnership items . . . included on [a partner's] return" may be

18

2009 notice a deficiency in Chai's income tax that would result from the approximately $2.4 million upward adjustment to Chai's income if his share of the Mercato loss were removed. That is, if Chai's reported $11.1 million share in Mercato's losses were ignored, his overall loss would decrease from approximately $11.5 million to approximately $400,000; the $2.4 million adjustment would therefore result in $2 million of taxable income. On October 30, 2009, the Commissioner filed an Amendment to Answer in Chai's deficiency proceeding asserting an additional deficiency in income tax ($563,868) and a corresponding additional 20% penalty ($112,773.80).[12]

On June 3, 2013, the *Mercato* proceeding concluded. In an order dated September 13, 2013, the Tax Court disallowed all of Mercato's losses for 2003. Under I.R.C. § 6229(d), the IRS had one year from that date to assess any computational deficiency in Chai's 2003 income tax and penalty.

In December 2013, at the beginning of trial in Chai's personal deficiency proceeding, Chai moved to dismiss for lack of jurisdiction the claims made by the Commissioner in

---

subject to subsequent adjustment in a partnership proceeding, those items "are completely ignored [for purposes of] determin[ing] if a deficiency exists that is attributable to nonpartnership items." 92 T.C. at 74.

[12] This resulted in a total deficiency in income tax and self-employment tax of $627,619 and a total penalty of $125,524, for a total owed by Chai of $753,143.

19

his 2009 Amendment to Answer.[13]  Chai did not dispute the disallowance of the Mercato loss.  Instead, he argued that, rather than asserting the additional claims for income tax due after disallowance of the Mercato losses in Chai's present deficiency proceeding, the Commissioner had to issue a notice of computational adjustment—the method by which the IRS notifies partners of purely computational deficiency assessments and related penalties resulting from the application of the outcome of a partnership-level proceeding to their returns.  *See* I.R.C. §§ 6225, 6230(a)(1).

The Commissioner countered that he had "properly recomputed the [asserted] deficiency and penalty" in the 2009 Amendment to Answer by removing Chai's share of the partnership loss from the computation, as required by *Munro*.  Supp. App'x 10-11.  Alternatively, the Commissioner argued, even if *Munro* did not apply because the *Munro* computation here would effect a complete, rather than partial, disallowance of the partnership losses, the Tax Court could "now take jurisdiction and rule on" the recomputed amounts pursuant to its I.R.C. § 6212 deficiency jurisdiction (as augmented by I.R.C. § 6214(a)).

---

[13] Chai argued that the Commissioner had misconstrued *Munro*, and had, in essence, anticipated that the proposed adjustments to the Mercato partnership return would be vindicated in the *Mercato* proceeding in violation of *Munro. See* Supp. App'x 4 (noting that the Tax Court in *Munro* "reject[ed the Commissioner's] argument that proposed adjustments to partnership items can be taken into account in computing a [partner's] deficiency" (quoting *Munro*, 92 T.C. at 74)).

Supp. App'x 17. In support, the Commissioner relied on *Harris v. Commissioner*, 99 T.C. 121, 123 (1992), for the proposition that "once partnership items are resolved, the Court may take those partnership items into account for computational purposes in a [partner's previously initiated] deficiency proceeding." Supp. App'x 17 (citing *Harris*, 99 T.C. at 123).

The Commissioner alternatively argued (as he does here) that the $2 million payment (or the deficiency attributable thereto) was an "affected item" under I.R.C. §§ 6230(a)(2)(A)(i) and 6231(a)(5). He asserted that the claim for the increased deficiency was contingent upon the Tax Court's resolution of the dispute over the $2 million payment from Delta, which the IRS termed a substantive "partner-level [individual taxpayer] determination" with respect to an "affected item." Supp. App'x 13. As the Commissioner has now acknowledged, it was an odd fit. Nevertheless, recognizing that the affected-item argument might render the Amendment to Answer ineffective to confer jurisdiction over the additional deficiency, the Commissioner also sought leave to amend the answer again to formally reassert the income-tax deficiency claim now that the *Mercato* proceeding was final.[14] The Tax Court

---

[14] The Commissioner also acknowledged that his argument, if credited, would render the penalty immediately assessable under I.R.C. § 6230(a)(2)(A)(i), thereby depriving the Tax Court of jurisdiction over that claim in the deficiency proceeding. The Commissioner abandoned the claim for the penalty.

granted leave to file what it restyled as the "First Amendment to Answer" on April 24, 2014.

## V.    THE TAX COURT'S RULINGS

### A. The Jurisdictional Ruling

On February 13, 2015,[15] the Tax Court granted Chai's motion to dismiss, holding that it lacked jurisdiction over the Commissioner's claim for additional income tax. The court agreed with Chai that the 2009 Amendment to Answer attempted "to increase a taxpayer's deficiency based on the Commissioner's proposed, but unadjudicated, adjustments to . . . partnership items" in violation of *Munro*. Supp. App'x 40. The court did not address the Commissioner's now-primary argument that, even if *Munro* did not allow the amendment, under *Harris* the court obtained jurisdiction over the newly added claims once the *Mercato* decision became final simply by virtue of its I.R.C. § 6212 deficiency jurisdiction (as augmented by I.R.C. § 6214(a)).

The court also rejected the Commissioner's argument that it obtained jurisdiction by virtue of the First Amendment to Answer based on the affected-item theory. The "critical inquiry" under an affected-item theory, said the court, was "whether the increased deficiency . . . requires a partner-level determination before it can be assessed." Supp. App'x 42. The court held that it did not:

---

[15] This was long after the expiration of the one-year period within which the IRS could assess deficiencies by computational adjustment. *See* I.R.C. § 6229(d).

22

> There is no factual determination that must occur in the petitioner's deficiency proceeding before respondent can apply the results of the [*Mercato*] proceeding. The disallowed losses from the [*Mercato*] proceeding can be applied to petitioner's 2003 income taxes regardless of the outcome of this deficiency proceeding (whether the $2 million at issue in this case is taxable non-employee compensation or a return of capital).

Supp. App'x 43. In the court's view, "section 6230(a)(1) requires that the results of the [*Mercato*] proceeding be applied to [Chai] through a Notice of Computational Adjustment." Supp. App'x 43. Thus, the court found that the First Amendment to Answer did not give the court jurisdiction over the increased deficiency.

The Commissioner moved for reconsideration, noting that he had already applied the results of the *Mercato* proceeding to Chai's 2003 tax return in an August 2014 notice of computational adjustment—that is, he automatically applied the disallowed loss to Chai's then-agreed upon income—$49,869—and determined income tax thereon. However, the Commissioner explained, the IRS could not apply the additional deficiency claimed as a result of the $2 million Delta payment without treating it as taxable income in its computations. And it could not treat the payment as taxable income because the court had not yet ruled in the deficiency proceeding that Chai had received the payment as gross income, rather than as a return of capital or a gift. In other words, the

Commissioner argued, the partner-level ruling regarding the proper treatment of the $2 million payment was necessary before it could assess the additional deficiency. The Tax Court denied the motion for reconsideration, without comment, on April 16, 2015.

### B. The Self-Employment Tax Ruling

On May 6, 2015, the Tax Court entered its final decision upholding the deficiency in Chai's self-employment tax and an accuracy-related penalty. The court noted that "[t]he character of a payment for tax purposes is determined by the intent of the parties, particularly the intent of the payor, as disclosed by the surrounding facts and circumstances." App'x 245-46 (collecting cases). Gross income, the court explained, "generally includes all income from whatever source derived, including compensation for services in the form of fees, commissions, or fringe benefits." App'x 245 (citing I.R.C. § 61(a)(1)). A return of capital or receipt of a gift, on the other hand, is not taxable income.

Here, the court found that the trial testimony and record evidence (including the contemporaneous email exchange with Del Bove and other correspondence between Chai and Delta personnel) supported the conclusion that the $2 million payment was compensation subject to self-employment tax. The court rejected Chai's attempts to minimize his role in the tax shelters, finding instead that his role "was a critical component of the transactions and the tax shelters could not have functioned as planned without [his] participation." App'x 246. Additionally, the court

24

found that the evidence contradicted Chai's characterization of the payment as a return of capital. Instead, the evidence showed that Chai was not a partner or investor in Delta and did not have a capital investment in any tax-shelter entity after 2001. Neither was the payment a gift from Beer, the court held, as "[t]he record is devoid of any evidence suggesting that the payment resulted from detached and disinterested generosity." App'x 255. Finally, the court held that, as necessary to be subject to self-employment tax, "the record demonstrate[d] that [Chai] accommodated tax shelters with sufficient continuity, regularity, and a profit motive such that he was engaged in a trade or business as a tax shelter accommodating party." App'x 253.

## C. The Penalty Ruling

In post-trial briefing, Chai argued for the first time that the Commissioner had failed to satisfy his burden of production under I.R.C. § 7491(c) "by not introducing evidence of his compliance with section 6751(b)(1)," which requires written supervisory approval of certain penalty determinations. App'x 256. The court declined to consider Chai's argument, finding it untimely and that the Commissioner would be prejudiced by its consideration.

The court then upheld the 20% accuracy-related penalty asserted in the notice of deficiency. The court held that the Commissioner had satisfied his burden to prove the existence and amount of deficiency, and that Chai failed to satisfy the reasonable-cause exception because he could not establish justified reliance on his accountant.

Chai filed a timely notice of appeal on May 18, 2015, and the Commissioner filed a notice of cross-appeal on July 24, 2015.

## VI.   PROCEEDINGS IN THIS COURT

In January 2016, Chai moved to dismiss as untimely the Commissioner's cross-appeal, arguing that the Tax Court's February 2015 jurisdictional order dismissing the IRS's claims for the additional deficiency and penalty was an immediately appealable "dispositive order" within the meaning of Tax Court Rule 190(b)(1).   In March 2016, a panel of this Court denied Chai's motion, citing *Estate of Yaeger v. Commissioner*, 801 F.2d 96, 98 (2d Cir. 1986).

## DISCUSSION

We review *de novo* the Tax Court's legal conclusions and for clear error its factual findings.  *Callaway*, 231 F.3d at 115 (citing I.R.C. § 7482(a)(1)).  "In particular, '[w]e owe no deference to the Tax Court's statutory interpretations, its relationship to us being that of a district court to a court of appeals, not that of an administrative agency to a court of appeals.'" *Id.* (alteration in original) (quoting *Exacto Spring Corp. v. Comm'r*, 196 F.3d 833, 838 (7th Cir. 1999)).

## I.   THE JURISDICTIONAL RULING

### A. We Have Jurisdiction Over the Commissioner's Cross-Appeal

As an initial matter, Chai again asserts that the Commissioner's cross-appeal is untimely.  While we need not revisit our prior decision denying his motion to dismiss, we explain briefly why it stands.

With exceptions not relevant here, the United States Courts of Appeals "have exclusive jurisdiction to review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). In the context of an appeal from a district court decision, "[f]ederal appellate jurisdiction generally depends on the existence of a decision by the District Court that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)); *see also* 28 U.S.C. § 1291 (generally limiting appellate jurisdiction to "appeals from . . . final decisions of the district courts"). The Third Circuit has stated that "[j]urisdiction under section 7482(a)(1) . . . extends only to a 'final decision' of the tax court." *N.Y. Football Giants, Inc. v. Comm'r*, 349 F.3d 102, 105 (3d Cir. 2003) (quoting *Ryan v. Comm'r*, 680 F.2d 324, 326 (3d Cir. 1982)). This Court has held "that Tax Court decisions are appealable only if they dispose of an entire case." *Estate of Yaeger*, 801 F.2d at 98. A notice of appeal from the Tax Court must be filed within 90 days of the entry of such "decision," or within 120 days of the entry of "decision" if another party has filed a timely notice of appeal. I.R.C. § 7483.

Here, the Tax Court entered its final decision on May 6, 2015.[16] Chai filed a notice of appeal 12 days later. The

[16] The March 2015 Memorandum and Findings of Fact and Opinion and the April 2015 order were not labeled as

Commissioner filed a notice of appeal on July 24, 2016, 49 days after entry of the Tax Court's decision and well before the 120-day limit set by § 7483. The Commissioner's notice was therefore timely.

Chai contends that the Commissioner's notice was untimely because the Tax Court's February 13, 2015 dispositive order concerning its jurisdiction over the income-tax deficiency was the operative final decision for the cross-appeal. An order is an appealable final decision only when it was "clearly intended to end a litigation." *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 178 (2d Cir. 2000). Because the Tax Court's February 13, 2015 order was not intended to dispose of the Commissioner's initial self-employment-tax-deficiency claim and end the proceeding in the Tax Court, that order was not immediately appealable. *See Coopers & Lybrand*, 437 U.S. at 467.

Chai's central argument that Tax Court Rule 190(b)(1), which provides that a "dispositive order . . . shall be treated as a decision of the Court for purposes of appeal," rendered the February 13, 2015 order immediately appealable is meritless. As discussed above, a final decision must clearly be intended to end the litigation; Rule 190(b)(1)

---

"decisions" and no party has argued that the filing of those documents began the time for appeal. The March entry stated that a "decision" reflecting the opinion would be entered at a later date. App'x 264.

does not address finality and must be read in a manner consistent with the statutory finality requirement.

We also reject Chai's argument that the February 13, 2015 order was final and appealable under I.R.C. § 7481(a)(1), which provides that a "decision of the Tax Court shall become final . . . [u]pon the expiration of the time allowed for filing a notice of appeal." That subsection addresses finality only when a "[t]imely notice of appeal [has] not [been] filed," *see id.*, without dictating when the time to file a notice begins. Chai's argument thus begs the question in the present case.

## B. The Tax Court's Jurisdictional Ruling was Incorrect

The odd posture of this case has confounded even the Commissioner; he has offered several theories to support his request for reversal, only to abandon them to focus on others. The problem is that the Internal Revenue Code's jurisdictional provisions have gaps, and this case lands neatly within one. The irony is that no one—not even Chai—disputes that, as a result of the decision in the *Mercato* proceeding disallowing the partnership losses, Chai has $2 million of net income on which he has not paid income tax. The question is, can the IRS collect it?

More precisely, we must decide whether the Tax Court had jurisdiction over the additional income-tax deficiency when the Commissioner filed the First Amendment to Answer at the conclusion of the *Mercato* proceeding, at some earlier time, or not at all. In plain English: Did the Tax Court have the authority to consider

the re-determination of Chai's partnership losses in deciding his income-tax liability resulting from his receipt of the $2 million Delta payment—a payment that had nothing to do with his Mercato partnership interest?

The Commissioner has abandoned his prior reliance on *Munro* and instead advances two somewhat contradictory arguments as to how the Tax Court erred in its jurisdictional analysis. His primary argument is that, for much the same reasons set forth in *Harris*, the Tax Court obtained jurisdiction over the increased deficiency because the Commissioner's First Amendment to Answer was filed after the conclusion of the *Mercato* proceeding and prior to the Tax Court's decision in Chai's deficiency proceeding. Alternatively, the Commissioner argues that the claim for the increased deficiency is attributable to an "affected item," requiring a partner-level determination. Chai responds that *Harris* is inapposite and that this is not an affected-item case. He seems to suggest, as did the Tax Court, that the only way for the Commissioner to have assessed the additional deficiency was by issuing a notice of computational adjustment" under I.R.C. § 6230(c)(2)(A).

This case does not fit neatly into the statutory methods marrying TEFRA and deficiency proceedings. *See* I.R.C. § 6234. But procedural oddities do not mean the tax is uncollectible. For the following reasons, we are persuaded that the Tax Court erred in dismissing the Commissioner's claim for the additional income-tax deficiency.

We start with two uncontroversial premises. *First*, the IRS could not have assessed the income-tax deficiency attributable to the $2 million Delta payment until the *Mercato* proceeding concluded. It is textbook tax law, affirmed in *Munro*, that any increased deficiency (and penalty) attributable to a proposed, but not-yet-adjudicated, adjustment to a partnership item at issue in a TEFRA proceeding must await the outcome of the partnership-level proceeding. *Munro*, 92 T.C. at 74; *see also GAF Corp.*, 114 T.C. at 521-28 (dismissing for lack of jurisdiction a notice of deficiency issued prior to the completion of related partnership-level proceedings). *Second*, as a general matter, the scope of a deficiency proceeding may be expanded to cover any additional deficiencies for the tax year beyond those asserted in a statutorily-compliant notice of deficiency that is the subject of the proceeding. *See* I.R.C. § 6214(a) ("[T]he Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or any addition to the tax should be assessed, if claim therefor is asserted by the Secretary [through the Commissioner] at or before the hearing or a rehearing.").

The Tax Court's decision was, at bottom, based on the blanket assertion that, because the increased deficiency was not an "affected item" under § 6230(a)(2)(A)(i), "section 6230(a)(1) *require[d]* that the results of the [*Mercato*] proceeding be applied to [Chai] through a Notice of Computational Adjustment." Supp. App'x 43 (emphasis

31

added); *see* I.R.C. § 6230(a)(1) ("Except [in certain circumstances], subchapter B of this chapter [i.e., deficiency procedures] shall not apply to the assessment or collection of any computational adjustment."). We agree that neither the increased deficiency attributable to the $2 million payment by virtue of the disallowed Mercato losses nor the $2 million payment itself is an "affected item." As the Commissioner has effectively conceded in arguing its primary position, the $2 million Delta payment is not an "affected item," since "the disallowance of the Mercato loss has no bearing on whether $2 million is includible in [Chai's] income." Comm'r Br. 50 n.16. In other words, the proper treatment of the $2 million payment was unaffected by the *Mercato* proceeding; the disallowance affected only the tax consequences of that treatment. And an increased deficiency in itself is not an affected item for purposes of § 6230(a)(2)(A)(i), since that section refers to deficiencies as attributable to (not themselves constituting) affected items.

We disagree, however, with the Tax Court's framing of the inquiry as "whether the increased deficiency is an affected item that requires a partner-level determination before it can be assessed" and its conclusion that, where § 6230(a)(2) does not apply, the results of the partnership-level proceeding *necessarily* must be applied to the taxpayer through a notice of computational adjustment. Supp. App'x 42. We conclude, to the contrary, that a computational adjustment is not the only method that may be employed when § 6230(a)(2) does not apply. When a computational adjustment is not feasible, § 6230(a)(1)'s bar

on the use of deficiency procedures does not apply. This case illustrates the point.

The IRS did exactly as the Tax Court prescribed with respect to the income Chai did report—in the August 2014 computational adjustment, the Commissioner calculated $10,269 of tax on the $49,869 of *other* income that Chai stated on his 2003 return. The Tax Court and Chai seem to suggest, however, that the IRS should have also included in its computational adjustment the income-tax deficiency attributable to the unreported $2 million Delta payment. But Chai did not report the $2 million payment as income on his 2003 return. Thus, in order to assess the deficiency the Commissioner still needed a determination in Chai's individual deficiency proceeding as to the nature of the $2 million payment—i.e., as the Tax Court put it, "whether the $2 million at issue in this case [was] taxable non-employee compensation or a [non-taxable] return of capital." Supp. App'x 43. The Tax Court and Chai would have the IRS collect the tax purportedly due on a payment, the treatment of which was the subject of ongoing deficiency proceedings.

This is an odd position for Chai to take. He is essentially arguing that the Commissioner should have denied him a prepayment forum to adjudicate the treatment of the $2 million payment simply by virtue of the disallowance of the partnership losses, belying a fundamental axiom of the Federal income tax structure: A taxpayer is typically "entitled to an appeal and to a determination of his liability for the tax prior to its payment." *Flora v. United States*, 362 U.S. 145, 159 (1960) (quoting H.R. Rep. No. 68-179, at 7 (1924)). We have no

33

doubt that had the Commissioner done as Chai suggests—assess by computational adjustment a deficiency attributable to a still-disputed $2 million payment—Chai would have cried foul, taking the position exactly opposite to the one he adopts now. A notice of computational adjustment was not the answer.

So what was? It cannot be that the additional deficiency is insulated from assessment simply because of the timing of the conclusion of the partnership-level proceeding. By that we mean, had the *Mercato* proceeding concluded after the Tax Court determined in Chai's deficiency proceeding that the $2 million Delta payment constituted income, the IRS could have assessed the additional income-tax deficiency in a notice of computational adjustment. But, under the Tax Court's approach, the additional tax is unassessable simply because the *Mercato* proceeding concluded before the Tax Court determined the proper treatment of the unreported $2 million payment—i.e., before the IRS had the legal predicate to assess Chai's additional income-tax deficiency. We read neither § 6230 nor any other statutory provision to require the anomalous result of depriving the Tax Court of deficiency jurisdiction in all cases where § 6230(a)(2) does not apply.

*Harris* supports our conclusion. In *Harris*, the Tax Court rejected the Commissioner's argument that it lacked jurisdiction to consider the effect of a separate TEFRA partnership proceeding in an ongoing deficiency proceeding. The court acknowledged that, under I.R.C. § 6230(a)(2)(A)(ii), a TEFRA "settlement is applied to a

34

partner by means of a computational adjustment and not under the ordinary deficiency . . . procedures," but it did not read that provision to deprive the court "of jurisdiction to take account of the settled items pursuant to section 6214(b)." *Harris*, 99 T.C. at 126. The court reasoned:

> [A]fter a settlement has been reached, the substantive partnership level issues have been resolved, and all that remains is the mechanical procedure of applying such settlement to the partner. Once substantive partnership level determinations have been made, the congressional objective in enacting the TEFRA partnership provisions has been accomplished. Consequently, the provisions mandating separation of partner and partnership level proceedings can be relaxed.

*Id.* (citing *Munro*, 92 T.C. at 73-74).

The Commissioner reads *Harris* as standing for the proposition that the TEFRA-mandated adjustments subsequent to the filing of the notice of deficiency "become subsumed within the partner's then-existing deficiency posture, and the court continues to exercise its standard deficiency jurisdiction (as augmented by § 6214(a), if the subsequent adjustments result in a claim for an increased deficiency)." Comm'r Br. 48. That is, "once the *Mercato* decision became final, the resulting $11.1 million adjustment to [Chai's] income became

subsumed within his then-existing deficiency posture." *Id.*

Chai responds that the Commissioner's theory "attempts to avoid TEFRA and use ordinary deficiency procedures to apply the results of *Mercato* to [Chai]." Chai Reply Br. 10. He argues that *Harris* is inapposite, largely because of details the Commissioner elided. *Harris*, Chai asserts, relied on the fact that "[w]hen the Commissioner and a partner enter into a settlement with respect to partnership items, however, *such items become non-partnership items*. Sec. 6231(b)(1)(C)." Chai Reply Br. 12-13 (alteration in original) (quoting *Harris*, 99 T.C. at 126 (emphasis added)). Here, Chai argues, there was no settlement and the disallowed Mercato losses therefore were not converted into nonpartnership items. *See* Chai Reply Br. 13-14.

Chai misreads *Harris* and § 6230(a)(2)(A)(ii). True, settled partnership items become nonpartnership items pursuant to § 6231(b)(1) and there was no settlement here. Also true, § 6230 specifically provides that deficiency procedures apply to certain "items which have become nonpartnership items." I.R.C. § 6230(a)(2)(A)(ii). But the jurisdictional dispute in *Harris* arose precisely from the fact that, under § 6230, deficiencies attributable to settled partnership items—unlike deficiencies attributable to other "items which have become nonpartnership items"—are *excepted* from the deficiency procedures. I.R.C. § 6230(a)(2)(A)(ii) (stating that deficiency procedures apply to "items which have become nonpartnership items (*other than by reason of section 6231(b)(1)(C)*)") (emphasis added));

36

*see* I.R.C. § 6231(b)(1)(C) (providing that partnership items become nonpartnership items  upon settlement).  Thus, it mattered not that the settled items became nonpartnership items under § 6231(b)(1)(C).  The point is, the settled items were not subject to the deficiency procedures under § 6230(a)(2)(A)(ii), but were nevertheless found to be the proper subject of a deficiency proceeding by the *Harris* court.    Thus,   as   the   Commissioner   explains,   "for jurisdictional purposes, the erstwhile partnership items in *Harris* are indistinguishable from the Mercato partnership items."  Comm'r Reply Br. 10-11.

We   agree.    Section   6230(a)(2)(A)(ii)   was   meant   "to enable the Commissioner to collect amounts due as a result of settlements without the necessity of issuing a statutory notice of deficiency," not to deprive the Tax Court of jurisdiction to decide cases like this.  *See Harris*, 99 T.C. at 126.  That does not mean purely computational adjustments will not continue to be assessed via notice of computational adjustment, outside of normal deficiency procedures. Indeed, the IRS used that procedure here.  The results of the *Mercato* proceeding—applied to Chai by computational adjustment—increased Chai's taxable income to $49,869,[17] and § 6230 did not require the Tax Court to ignore the effect of that increase on the deficiency computation in the ongoing deficiency proceeding. Rather, the Tax Court had

---

[17] This is the amount of Chai's agreed upon income after taking account of the disallowed partnership losses, but without factoring in the $2 million Delta payment because its treatment was still uncertain.

jurisdiction to redetermine the deficiency by virtue of I.R.C. § 6214(a) upon the conclusion of the *Mercato* proceeding. For those reasons, we hold that the Tax Court erred in concluding that it lacked jurisdiction over the additional income-tax deficiency attributable to the $2 million Delta payment.

This result is not inconsistent with I.R.C. § 6234 or *Munro.* At first blush, this would appear the ideal case for the IRS to issue a § 6234 notice of adjustment, which provides a declaratory judgment procedure for asserting deficiencies relating to oversheltered returns prior to the conclusion of partnership-level proceedings. However, the provision (read literally) does not apply to situations where the adjustments to nonpartnership items would result in a deficiency even if the partnership losses were given effect. *See* I.R.C. § 6234(a)(3) (applying where "the adjustments resulting from such determination do not give rise to a deficiency (as defined in section 6211) but would give rise to a deficiency if there were no net loss from partnership items"). The typical example is where the IRS asserts a deficiency in income that would result in an adjusted net income so much greater than the taxpayer's partnership losses that the adjustment would result in a deficiency even if the partnership losses are allowed.

But this case is a bit different. If Chai's partnership losses were given effect, the adjustment to Chai's nonpartnership item (the $2 million payment) would still result in a self-employment tax deficiency (since self-employment income is not offset by partnership losses), but not an income-tax deficiency (since his partnership losses

would still far exceed his adjusted net income). Because a deficiency—albeit not an income-tax deficiency—would exist, we agree with the Commissioner that § 6234 was not available. *See* Comm'r Br. 42 (asserting that § 6234 does not apply "because the adjustment gave rise to an asserted deficiency in self-employment tax notwithstanding [Chai's] reported share of the Mercato loss").

This makes sense in light of § 6234. Where there is no deficiency after crediting partnership losses, the IRS cannot issue a timely notice of deficiency (which would suspend the limitations period for deficiencies attributable to nonpartnership item adjustments) prior to the conclusion of the partnership-level proceeding; that is where § 6234 comes into play. But the existence of the self-employment-tax deficiency here gave the IRS a basis for a valid notice of deficiency, obviating the need for a § 6234 notice.

Further, in instances like this, where § 6234 does not apply, *Munro* typically continues to apply, except, the Commissioner argues, "where . . . the non-partnership income reported on an oversheltered return is itself zero or negative," and "the *Munro* computation [thereby] has the same effect as a complete disallowance of the partner's reported share of the partnership loss, contrary to the intent of the TEFRA provisions." Comm'r Br. 42-43; *accord* IRM 4.31.6.2.5.1 (Aug. 1, 2006). While we are skeptical about the Commissioner's argument (for reasons set forth in the

margin),[18] there is no need to decide whether *Munro* applied here. *Munro* provides a method for computing (and suspending the limitation period for) partner-level deficiencies attributable to nonpartnership items prior to the conclusion of the partnership-level proceedings. Because the *Mercato* proceeding ended before Chai's personal deficiency proceeding, *Munro* is inconsequential. Once the *Mercato* proceeding concluded, the Tax Court had jurisdiction by virtue of its standard I.R.C. § 6212 deficiency jurisdiction (as augmented by I.R.C. § 6214(a)).

## II.    THE SELF-EMPLOYMENT TAX RULING

### A. Standard of Review

This Court reviews the Tax Court's factual findings as to whether Chai's role in Beer's tax shelters constituted a "trade or business" within the meaning of I.R.C. § 1402(a) under the clearly erroneous standard. *UFCW Local One Person Fund v. Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015) ("*UFCW Local One*"). "Where there are two permissible views of the evidence, the factfinder's choice

---

[18] *Munro* held that partnership items must be "completely ignored [for purposes of] determin[ing] if a deficiency exists that is attributable to nonpartnership items." 92 T.C. at 74. The decision contemplates that, even ignoring partnership items, the deficiency attributable to nonpartnership items may ultimately be determined to have been overstated if certain partnership items are upheld. *Munro* did not say that it applies only when the computation would have the effect of a partial, as opposed to total, disallowance of the partner's reported share of partnership losses.

40

between them cannot be clearly erroneous." *Id.* (quoting *Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 870 (2d Cir. 1994)). "However, the district court's application of those facts to draw conclusions of law . . . is subject to *de novo* review." *Id.* (omission in original) (quoting *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994)).

## B. The Two-Prong *Groetzinger* Standard

Under I.R.C. § 1401, self-employment taxes (which amount to the equivalent combined Social Security and Medicare taxes on wages imposed by the Federal Insurance Contributions Act) are imposed on "the net earnings from self-employment derived by an individual . . . during any taxable year." I.R.C. § 1402(b). "[N]et earnings from self-employment" is defined generally as "the gross income derived by an individual from any *trade or business* carried on by such individual." I.R.C. § 1402(a) (emphasis added).

While § 1402 does not define "trade or business," the Supreme Court in *Commissioner v. Groetzinger*, 480 U.S 23, 32-36 (1987), considered the meaning of the phrase as it appears in I.R.C. § 162(a). *Groetzinger* noted that the terms are "broad and comprehensive," *id.* at 31, and that the determination of whether a taxpayer is carrying on a trade or business "requires an examination of the facts in each case," *id.* at 36 (quoting *Higgins v. Comm'r*, 312 U.S. 212, 217 (1941)). The Court confined its construction of the term to the tax statute at issue in that case and "d[id] not purport to construe the phrase where it appears in other places." *Id.* at 27 n.8. However, the phrase "trade or business" in § 1401

41

(at issue here) is to be given the same meaning as the same phrase in § 162. I.R.C. § 1402(c). Thus, as the parties agree, "*Groetzinger's* construction of 'trade or business' is the most helpful authoritative pronouncement available, and worthy of reliance here." *UFCW Local One*, 791 F.3d at 373. Accordingly, for Chai's role in the tax shelters to be a "trade or business" under § 1401, he must have engaged in the activity: "(1) for the primary purpose of income or profit; and (2) with continuity and regularity." *Id.* (citing *Groetzinger*, 480 U.S. at 35). "A sporadic activity, a hobby, or an amusement diversion does not qualify." *Groetzinger*, 480 U.S. at 35.

### Primary Purpose

The Tax Court dealt with this prong swiftly, and rightly so, finding that Chai "was paid for his services through large lump-sum payments that were reported by the payors as nonemployee compensation on Forms 1099 and . . . reported the payments as self-employment income." App'x 253. As the Commissioner notes, the sums Chai received from his tax-shelter dealings "dwarfed the amounts he reported as income from his partnership interest in an architectural firm." Comm'r Br. 63. It is quite clear that Chai's primary purpose was to earn compensation in exchange for his services as an accommodating party.

Chai asserts that his sole motive was that of an investor—that he agreed to serve as an accommodating party only in the hope of reaping investment gains. The Tax Court rightly rejected that portrayal of the facts. Beer

42

testified that the large sums paid to Chai were largely derived from the fees that Delta received from its clients, not from any increase in the value of Chai's holdings. The whole point of the shelter scheme was to neutralize any purported returns on investment by generating offsetting losses.

Chai emphasizes, however, that Beer's testimony also explained there was an opportunity to profit on the underlying investments, and that at least some of the $2 million payment was "directly attributable to the profitability of the underlying derivative transactions entered into by the tax shelter entities." Chai Reply Br. 24-25. That may be true, and Chai may have been paid less if the scheme did not do as well, but there is no evidence that he stood to go without compensation at all. That Chai had an interest in the investment performance of the tax shelters does not mean he was solely an investor in them. Moreover, the unsurprising fact that his payment was, in part, derived from the shelters' investment gains does not negate the fact that it was largely drawn from client fees. Chai was not simply an investor in the tax shelters—he performed a service by acting as an accommodating party and was compensated as such. The Tax Court did not clearly err in discrediting Chai's contrary testimony and concluding that he agreed to serve as accommodation party in order to earn compensation.

Much of Chai's argument focuses on factors set forth in Treas. Reg. § 1.183-2(b)—the "hobby loss" provision—to show that he lacked profit motive. The "hobby loss" provision is focused on limiting or disallowing deductions

for any activity not denominated a "trade or business" under § 162 or an activity not engaged in for the production of income under § 212. Treas. Reg. § 1.183-2(a). The factors on which Chai relies are meant to guide the analysis of whether the activities for which a taxpayer has claimed an I.R.C. § 183 deduction were "carried on primarily as a sport, hobby, or for recreation," or instead primarily for profit (in which case expenses are deductible). Treas. Reg. § 1.183-2(a). Chai does not (and could not credibly) argue that his role as accommodating party was purely for pleasure. Nor does he assert that his conduct was a hobby; rather, he says it was to seek a return on investment. The § 183 factors were not designed to distinguish between investment return and profit motives. Indeed, Chai has cited no case law applying them to a case like this. And even to the extent § 183 is useful in this context, the Tax Court's factual conclusion that Chai had a profit motive was not clearly erroneous.

> The Treas. Reg. § 1.183-2 factors are:
>
> (1) The manner in which the taxpayer carries on the activity; . . .
> (2) The expertise of the taxpayer or his advisors; . . .
> (3) The time and effort expended by the taxpayer in carrying on the activity; . . .
> (4) Expectation that assets used in the activity may appreciate in value; . . .
> (5) The success of the taxpayer in carrying on other similar or dissimilar activities; . . .
> (6) The taxpayer's history of income or losses with respect to the activity; . . .

44

(7) The amount of occasional profits, if any, which are earned; . . .

(8) The financial status of the taxpayer; and . . .

(9) Elements of personal pleasure or recreation involved in the activity.

Treas. Reg. § 1.183-2(b). Chai admits, and the Commissioner does not dispute, that factors (4), (7), and (9) are clearly inapplicable in this case. The others largely weigh against Chai.

Manner in which Chai carried on the activity. Chai asserts that he did not conduct his accommodating party activities in a businesslike manner, as "every decision made with respect to the tax shelter transactions was made by Bricolage." Chai Br. 46. He further claims that, once JJC was formed, "[he] did not even have to sign any documents," as "Bricolage did everything, including acting as the managing member of JJC." *Id.* Again, the Tax Court reasonably found that Chai engaged in businesslike activities in his capacity as accommodating party, and he cannot discount his role by citing his delegation of authority to an agent.

Chai nevertheless likens his case to *Sloan v. Commissioner*, 55 T.C.M. (CCH) 1238 (1988). There, Sloan, a full-time computer analyst who was also an attorney, planned to establish his own law practice after he retired from the U.S. Government, and began performing legal services for clients on weekends while still in the Government's employ. The Tax Court, analyzing whether Sloan was engaged in a "trade or business" under

45

*Groetzinger*, held, *inter alia*, that Sloan did not engage in the law practice with the primary purpose of earning a profit, but instead to gain experience that he could use when practicing in earnest post-retirement. *Id.* at 1241. Importantly, Sloan rarely billed clients, was not concerned with earning a profit, and relied on his computer-analyst job as his primary source of income. *Id.*

Chai, by contrast, was focused on making a profit (albeit, he says, through investment income), and his income from the tax shelters dwarfed the amounts received from his architecture practice. His role was far more businesslike than Sloan's, and was definitely no hobby.

Moreover, in attempting to offset income, Chai described certain capital losses as "disposition[s] of business property." Supp. App'x 156, 160-65. As the Commissioner notes, the use of the term "business property" suggests reliance on I.R.C. § 1231, which provides that net losses from sales of "property used in the trade or business" are treated as ordinary losses. I.R.C. § 1231(a)(2), (3). In another offsetting measure, Chai made a "mark-to-market" election for JJC under I.R.C. § 475(f), Supp. App'x 156, when such elections are limited to persons "engaged in a trade or business as a trader in securities," I.R.C. § 475(f)(1)(A). Thus, Chai now attempts to distance himself from his previous position—seeking in this litigation, as the Tax Court found, to use his delegation of authority to Bricolage "as a shield" from liability, App'x 252—while in the past having relied on his asserted businesslike involvement in Bricolage to obtain, affirmatively, favorable tax treatment. Chai cannot benefit

from claims of business and trade losses while denying income from the same endeavor.

Chai's and his advisor's expertise. Chai argues that he had no expertise in and barely understood tax-shelter transactions, and that he "relied solely on Mr. Beer's representations that the transactions were legal and might be profitable." Chai Br. 47-48. He seeks to contrast his case with *Bagley v. United States*, 963 F. Supp. 2d 982 (C.D. Cal. 2013).

In *Bagley*, the court found that Bagley—who was assessed income tax on the proceeds from various False Claims Act ("FCA") claims he prosecuted—and his private counsel were essentially operating the business of a private attorney general, given their vital expertise in prosecuting FCA cases. *Id.* at 996-97. Thus, the court found that Bagley engaged in for-profit activity. *Id.* at 998. Chai asserts that, in contrast to himself, Bagley "had first-hand knowledge of the fraudulent schemes, and the identity of relevant witnesses and the location of documentary evidence." Chai Br. 48 (quoting *Bagley*, 963 F. Supp. 2d. at 995).

Chai misses the point. Although Chai was not the mastermind of the tax-shelter scheme, the expertise relevant to our analysis is that of an accommodating party. While the role of accommodating party may not require extensive expertise, Chai (like Bagley) was amply qualified and proficient in the practice. Indeed, he carried out his role successfully for years. He need not have understood every piece of the bigger picture; he needed only to have understood the part he played, which he did.

47

Chai additionally asserts that he "received no advice from anyone regarding being a tax shelter accommodating party." Chai Br. 47. Even if that is true, it only bolsters the conclusion that he had the requisite minimal expertise to support his participation in the venture, since the scheme functioned with him as an essential cog and no one suggests that he was deficient in his role. Just as Bagley's "involvement . . . was part and parcel of the business Bagley was conducting," *Bagley*, 963 F. Supp. 2d at 996, Chai's role, which he ably fulfilled, was essential to the functioning of Beer's tax shelter business.

Time and effort expended by Chai. This factor weighs in Chai's favor, but does not overcome the rest. It is true that Chai's activities, although regular and continuous, were not time- or effort-intensive. But that is a function of the amount of time and effort required to be in the "trade or business" of being an accommodating party, and not a reflection of the nature of the activity. In other words, although it may not take much to be an accommodating party, Chai expended enough effort to be one.

Chai's success in similar activities. This factor deserves little weight, but clearly weighs in Chai's favor: he was not involved in similar activities before or after the activity at issue here.

History of income or loss. Chai's history of income from the tax shelters was regular and substantial, including lump-sum payments of $1.2 million in 2000, $1 million in 2001, and $2 million in 2003. The *Bagley* court found sufficient history of income where Bagley received only a

48

single FCA payout.  *Id.* at 997.  Chai's history of multiple, yearly, and substantial payouts is even more indicative of being in the business of being an accommodating party.[19]

Amount of occasional profits.  As the Commissioner points out, Chai omitted any analysis of this factor in his main brief.  In his Reply, he again skirts the issue.  But the regulations are clear that "substantial profit," even if "only occasional," is "generally . . . indicative that an activity is engaged in for profit."  Treas. Reg. § 1.183-2(b)(7).  Chai's profits were just that—substantial, but occasional.

Chai's financial status.  Chai misses the point, here, too.  He argues that "[i]n cases where the taxpayer has other, full-time employment, the requisite profit motive is generally missing."  Chai Br. 50.  He cites, *inter alia*, *Sloan* and *Levinson*.  In both cases, however, the activity at issue was a secondary source of income.  Here, by contrast, the

---

[19] Chai cites a single case in which the Tax Court found that a taxpayer who operated a retail store, but patented a few inventions for which he settled two patent-infringement suits. The Tax Court held that these activities were not continuous, but that it was too sporadic to be considered a trade or business.  *See* Chai Br. 49-50 (citing *Levinson v. Comm'r*, 77 T.C.M. (CCH) 2347 (1999)).  There was nothing sporadic about Chai's involvement in or income from the tax shelter; he received regular payments for the work done during those years. He also misreads the relevant inquiry as relating to his history of income in prior to his dealings with Beer.

payments Chai received in his capacity as accommodating party dwarfed his architecture income. *See* Comm'r Br. 63 (comparing incomes).

In light of the foregoing, we conclude that the Tax Court did not err in finding that Chai had the requisite profit motive to be engaged in the "trade or business" of being a tax shelter accommodating party, even assuming the "hobby loss" provision applies in this case.

### C. Continuity and Regularity

Applying the second *Groetzinger* prong, the Tax Court found that "[t]he record demonstrates that [Chai's] activities were continuous and regular." App'x 252. Chai testified that he went to Bricolage's offices "a lot" to execute voluminous documents in his capacity as accommodating party. App'x 252. The Tax Court found that the continuous and regular nature of Chai's activities was not affected by his "forming JJC, making Bricolage JJC's nonmember manager, and giving Bricolage power of attorney," particularly because "Bricolage's actions with respect to JJC are imputed to [Chai] as his agent." App'x 252.

That finding was bolstered by Chai's representations on Schedule C of his 2001 return for JJC, in which he stated that he "'materially participate[d]' in the operation of this business during 2001," thereby entitling him to favorable treatment under passive loss rules. Supp. App'x 146. In defining "material participation," the instructions to Schedule C describe various circumstances constituting "material participation," including "participat[ion] in the

50

activity on a regular, continuous, and substantial basis during [the tax] year," provided the participation exceeded 100 hours. 2001 Instructions for Schedule C, Profit or Loss From Business, at C-2; *see* Treas. Reg. §§ 1.469-5T(a)(7), (b)(2)(iii).

Attempting to downplay his role, Chai asserts that what the Tax Court considered "regular" activity "was nothing more than signing 'multiple binders' of documents to 'set up [the] corporations' that Mr. Beer used to facilitate his tax advantaged transactions." Chai Reply Br. 18 (quoting Supp. App'x 209) (alteration in original). In support, he emphasizes his own self-serving testimony and characterizes his role as including "going to Beer's offices for a few hours at a time," "having no regular schedule and going to the office only when requested by Bricolage," and "not having a physical office, assistant, or receiving mail." Chai Reply Br. 18. According to Chai, he "did not even draft the documents he signed; he was nothing more than a straw man. . . . He was nothing more than a pawn in a much bigger game." Chai Reply Br. 19, 22. Chai also disclaims any knowledge of the implications of his 2001 JJC return, stating that he "was not involved in the preparation of the return, and did not understand the complexity or the positions taken on the return." Chai Reply Br. 20.

At bottom, however, the record on which the Tax Court relied shows that the testimony of Chai and others, combined with Chai's representations on prior year returns, supports the Tax Court's conclusion that Chai undertook his activities with "continuity and regularity." *See Groetzinger*, 480 U.S. at 35. While it is true that Chai

51

maintained his architecture practice and was not as intimately involved with the nuances of the shelters as others like Beer, that does not render Chai's activities insufficiently regular and continuous for purposes of § 1401. That Chai has a different view of the evidence does not mean the Tax Court clearly erred. *See UFCW Local One*, 791 F.3d at 372. The Tax Court therefore properly held the $2 million Delta payment to constitute taxable self-employment income.[20]

## III.   THE PENALTY RULING

Chai argues that the Commissioner failed to meet his burden on the claim to impose an accuracy-related penalty.

---

[20] We need not consider Chai's argument, raised for the first time on appeal, that the $2 million Delta payment is not subject to self-employment tax because he was an employee. *See Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000) ("In general, 'a federal appellate court does not consider an issue not passed upon below.'" (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976))).

In any event, Chai's argument is meritless. Chai was an employee of Counterpoint and Bricolage Capital, but not Delta. He collapses all three into "Bricolage" and disregards their legal separateness. As the Commissioner explains, however, "[t]here is no authority for the proposition that a taxpayer's employment relationship with one entity precludes him from performing services for a related entity as an independent contractor." Comm'r Br. 66. Chai's employment relationship with Counterpoint and Bricolage Capital did not make him an employee, as opposed to an independent contractor, of Delta.

Specifically, he argues, as he did in his post-trial briefing, that compliance with I.R.C. § 6751(b)(1)'s written-approval requirement "is an element of the Commissioner's claim for penalties," and it is therefore "part of the Commissioner's burden [of production under § 7491(c)] to demonstrate compliance with" that requirement. Chai Br. 53. Because Chai raised the issue for the first time post-trial, the Tax Court declined to consider it.

The Commissioner originally did not dispute that the written-approval requirement is an element of a penalty claim so long as § 6751(b)(2)(B) (the electronic-means exception) does not apply. He argued that the Tax Court's decision not to consider the argument was not an abuse of discretion, and that, in any event, the penalty here did not require written approval because it was of the type assessed by electronic means. In a Federal Rule of Appellate Procedure 28(j) letter, however, the Commissioner now urges us to adopt the reasoning of the majority of a divided Tax Court in *Graev v. Commissioner*, 147 T.C. 16, No. 30638-08, 2016 WL 6996650 (2016),[21] which held that it is premature to argue the IRS failed to satisfy the written-approval requirements of § 6751(b)(1) until the Tax Court's decision on the penalty became final and the IRS assessed the penalty. Read that way, the Commissioner argues, the issue of compliance with the written-approval requirement

---

[21] Nine judges of the Tax Court signed the majority opinion; five judges signed a dissenting opinion; and three judges concurred in the judgment only. The concurring opinion did not address the issue of statutory construction.

is not ripe for review in a deficiency proceeding, and the issue of whether the Tax Court permissibly declined to consider Chai's argument in such a proceeding is therefore moot. This is a notable shift from the Commissioner's pre-*Graev* position that Chai's post-trial argument was too late. Now, the Commissioner argues that Chai's argument was not too late, but rather premature. Chai has not addressed *Graev*, but we must.

Deciding whether the Tax Court abused its discretion in failing to consider Chai's post-trial challenge requires us to determine first at what point the IRS's obligation to comply with the written-approval requirement kicks in. In other words, if compliance is required but may be obtained at any time prior to assessment of the penalty then, as the Commissioner now argues, the Tax Court was not required address the unripe issue. But if compliance is required before penalty proceedings begin, the Tax Court arguably abused its discretion in failing to consider Chai's argument.

Thus, this case requires us to decide which side in *Graev* got it right. On one side, the *Graev* majority held that the written approval may be obtained at any time before the penalty is assessed, and any challenge thereto must be lodged in a post-assessment proceeding. 2016 WL 6996650 at *10 & n.13. On the other side, the five dissenting members in *Graev* would hold that written approval must be obtained prior to the initiation of Tax Court proceedings regarding penalties. *Id.* at *29 (Gustafson, J., dissenting).

Before turning to *Graev*, we note that Chai's was not an electronic-means case, and therefore § 6751(b)(1)'s

written-approval requirement did apply. The Commissioner argues that the penalty here was excepted from § 6751(b)(1)'s written-approval requirement because it falls within the categories of penalties "automatically calculated through electronic means." Comm'r Br. 77 (quoting I.R.C. § 6751(b)(2)(B)). He does not argue that Chai's penalty was in fact calculated through electronic means. Instead, he cites the Internal Revenue Manual, which instructs IRS personnel that "the assessment of a penalty qualifies as one calculated through electronic means if the penalty is assessed free of any independent determination by an IRS employee as to whether the penalty should be imposed against a taxpayer." Comm'r Br. 78 (quoting IRM 20.1.1.2.3(5) (Aug. 5, 2014)).

The Commissioner's argument that the penalty imposed on Chai was "a matter of a mechanical computation," Comm'r Br. 77, is at odds with the nature of the specific penalty determination in this case. Here, the accuracy-related penalty, arising under I.R.C. § 6662(a), can be based on an underpayment of tax attributable to one or a combination of causes set forth under § 6662(b). The Commissioner, in the notice of deficiency, attributed Chai's underpayment to a substantial understatement of income tax, under § 6662(b)(2), *and/or* negligence or disregard of rules and regulations, under § 6662(b)(1). We are aware of no record evidence that this determination (particularly if it were a decision based on § 6662(b)(1)) was, or could have been, made electronically through the IMF Automated Underreporter Program. *See* IRM 4.19.3 (Aug. 26, 2016) (providing instructions for the Automated Underreporter, a

computerized system that uses information return matching to identify potentially underreported tax returns).

To the contrary, the Notice of Deficiency the Commissioner issued Chai in May 2009 indicates that the determinations were made by Deborah Bennett, Technical Services Territory Manager for the IRS, or a revenue agent working under her authority. *See* App'x 30. Form 886-A, which was included with the Notice of Deficiency, details why the IRS determined to assess the penalty, including that the IRS employee determined that Chai lacked reasonable cause for the underpayment. *See* App'x 40-41. The Commissioner's citation to the instruction manual is unconvincing, especially in light of the Chief Counsel's guidance. Because Chai's penalty was not imposed "*free of any independent determination by a Service employee as to whether the penalty should be imposed,*" *see* I.R.S. Gen. Couns. Mem. 200211040, at 3 (Jan. 30, 2002) (emphasis added), it was not "calculated automatically through electronic means." I.R.S. Gen. Couns. Mem. 2014004, at 2 (May 20, 2014). The IRS was therefore required to obtain written approval of the penalty pre-assessment.

We turn, then, to the issue of when that obligation attached—that is, whether compliance with the written-approval requirement of I.R.C. § 6751(b)(1) is an element of the Commissioner's penalty claim and therefore part of his burden of production. *See* I.R.C. § 7491(c) ("Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for

56

any penalty, addition to tax, or additional amount imposed by this title.").

"As in any case of statutory construction," we start our analysis, as did the *Graev* majority, "with 'the language of the statute.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992)). "[W]here the statutory language provides a clear answer, [our analysis] ends there . . . ." *Id.* However, "[i]f the meaning of the statute is ambiguous, [we] may resort to canons of statutory interpretation to help resolve the ambiguity." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir. 2002) (citation omitted). Section 6751(b)(1) provides, in relevant part:

> No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.

I.R.C. § 6751(b)(1).

We part ways with the *Graev* majority in its view that the statutory language is clear. *See Graev*, 2016 WL 6996650, at *10. The provision clearly requires written approval of the "initial determination of . . . assessment" before a penalty can be assessed. Its clarity ends there. The provision contains no express requirement that the written approval be obtained at any particular time prior to assessment. The *Graev* majority read the absence of specific language as to when the prior approval need be obtained to

57

mean that no specific timing requirement exists and thus the written approval need only be obtained at some, but no particular, time prior to assessment. We find ambiguity, however, where the *Graev* majority found none.

Understanding § 6751 and appreciating its ambiguity requires proficiency with the deficiency process. "Assessment" is the formal recording of a taxpayer's tax liability on the tax rolls.[22]   *See* I.R.C. § 6203 (stating that an assessment is "made by recording the liability of the taxpayer in the office of the Secretary in accordance with

---

[22] Treasury Regulation § 301.6203-1 provides:

> The district director and the director of the regional service center shall appoint one or more assessment officers. . . . The assessment shall be made by an assessment officer signing the summary record of assessment. The summary record, through supporting records, shall provide identification of the taxpayer, the character of the liability assessed, the taxable period, if applicable, and the amount of the assessment. The amount of the assessment shall, in the case of tax shown on a return by the taxpayer, be the amount so shown, and in all other cases the amount of the assessment shall be the amount shown on the supporting list or record. The date of the assessment is the date the summary record is signed by an assessment officer.

rules or regulations prescribed by the Secretary"). It is "essentially a bookkeeping notation" of what the taxpayer is required to pay the Government. *Laing v. United States*, 423 U.S. 161, 170 n.13 (1976); *see Hibbs v. Winn*, 542 U.S. 88, 115 (2004) (Kennedy, J., dissenting). In essence, it is the last of a number of steps required before the IRS can collect a "deficiency"—a tax liability greater than what the taxpayer reported on his return. Before it can "assess" a deficiency, the IRS must first determine a "deficiency" in a taxpayer's liability. *See* I.R.C. § 6201(a). The IRS then announces to the taxpayer in a notice of deficiency its intention to assess that deficiency. *See* I.R.C. § 6212(a). If the taxpayer does not file a Tax Court petition within 90 days, "the deficiency . . . shall be assessed." I.R.C. § 6213(c). If he does file a Tax Court petition for a "redetermination of the deficiency" within the 90-day period, however, the IRS is restricted from assessing the deficiency "until the decision of the Tax Court has become final." I.R.C. § 6213(a). It is then the Tax Court's job to determine whether a deficiency should be assessed and, if so, the amount thereof. *See* I.R.C. §§ 6214(a) ("[T]he Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency . . . ."), 6215(a) ("[T]he entire amount redetermined as the deficiency by the decision of the Tax Court which has become final shall be assessed . . . .").

In light of the historical meaning of "assessment," we agree with the *Graev* dissent that the phrase "initial determination of such assessment" is ambiguous. *See Graev*, 2016 WL 6996650 at *31 (Gustafson, J., dissenting). If "assessment" is the formal recording of a taxpayer's tax

liability, then § 6751(b) is unworkable: one can determine a deficiency, *see* I.R.C. §§ 6212(a), 6213(a), and whether to make an assessment, "but one cannot 'determine' an 'assessment.'" *Graev*, 2016 WL 6996650 at *31 (Gustafson, J., dissenting). We must therefore "consult legislative history and other tools of statutory construction to discern Congress's meaning." *United States v. Gayle*, 342 F.3d 89, 93 (2d Cir. 2003). It is particularly useful to "consider reliable legislative history" in cases like this where "the statute is susceptible to divergent understandings and, equally important, where there exists authoritative legislative history that assists in discerning what Congress actually meant." *Id.* at 94. "The most enlightening source of legislative history is generally a committee report, particularly a conference committee report, which we have identified as among 'the most authoritative and reliable materials of legislative history.'" *Id.* (quoting *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000)).

The report from the Senate Finance Committee on § 6751(b) states clearly the purpose of the provision and thus Congress's intent: "The Committee believes that penalties should only be imposed where appropriate and not as a bargaining chip." S. Rep. No. 105-174, at 65 (1998). The statute was meant to prevent IRS agents from threatening unjustified penalties to encourage taxpayers to settle. *IRS Restructuring: Hearings on H.R. 2676 Before the S. Comm. on Finance*, 105th Cong. 92 (1998) (statement of Stefan F. Tucker, Chair-Elect, Section of Taxation, American Bar Association) ("[T]he IRS will often say, if you don't

60

settle, we are going to assert the penalties."). That history strongly rebuts the *Graev* majority's view that written approval may be accomplished at any time prior to, even if just before, assessment. Allowing, as would the *Graev* majority, an unapproved initial determination of the penalty to proceed through administrative proceedings, settlement negotiations, and potential Tax Court proceedings, only to be approved sometime prior to assessment would do nothing to stem the abuses § 6751(b)(1) was meant to prevent. The *Graev* dissent put it succinctly:

> Th[e majority's] construction is implausible in the extreme—especially in an instance in which a penalty assertion becomes the subject of Tax Court litigation. Once Chief Counsel had argued and the Tax Court had held that the taxpayer is liable for an assessment, the supervisor's Johnny-come-lately approval of the "initial determination" would add nothing to the process. And where the Tax Court had held the taxpayer *not* liable for the penalty, the supervisor's consideration of the matter would then be completely moot.

*Graev*, 2016 WL 6996650 at *32 (Gustafson, J., dissenting).

The *Graev* majority gave short shrift to the legislative history, suggesting that the Tax Court's confirmation in the deficiency proceeding that the penalty was appropriate in Graev's case (regardless of compliance with § 6751(b)) cured any concerns that the penalty was used as a

61

bargaining chip. *Graev*, 2016 WL 6996650, at *14. That the penalty may have been appropriate in *Graev*, however, does not change Congress's intent or alleviate its concerns. If deficiency proceeding review of penalty determinations were sufficient to deter or detect the IRS's improper leveraging of undue penalties, then Congress would not have felt compelled to enact § 7491(c), which places the burden of production on the IRS in any court proceeding regarding the liability of a taxpayer for any penalty, along with § 6751. More to the point, Tax Court review does not solve the problem—penalties could still be used as bargaining chips to prompt settlement negotiations and, if successful, the Tax Court would be none the wiser (since the taxpayer would have settled, rather than have filed a Tax Court petition where the propriety of the penalty could be litigated).

Moreover, that the Tax Court found that the penalty was not improperly used as a bargaining chip in *Graev* could just as easily indicate that § 6751 (even if the written approval had not yet been obtained) is having its intended effect. Indeed, the IRS's current administrative practice requires a supervisor's approval to be noted on the form reflecting the examining agent's penalty determination or otherwise be documented in the applicable workpapers. IRM 20.1.5.1.4.1 (Dec. 13, 2016); *accord* IRM 20.1.5.1.6(4) (July 1, 2008); *see also* IRM 20.1.1.2.3(6) (Aug. 5, 2014) ("The managerial review and approval must be documented in writing and retained in the case file."); IRM 20.1.1.2.3(7) (Aug. 5, 2014) ("[T]he IRS may wish to provide the taxpayer with a courtesy copy of the document showing that a

manager approved the penalties."). Of course, the IRS's internal guidance is neither legally binding nor entitled to more deference than its persuasive value. *See Reno v. Koray*, 515 U.S. 50, 61 (1995); *Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385 (2d Cir. 2016) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). But, unlike the *Graev* majority, we do not find the guidance merely "salutary" and "immaterial to our conclusion." *Graev*, 2016 WL 6996650 at *12. Rather, it is a persuasive signal of the IRS's reading of § 6751 to require, as Congress intended, supervisory approval prior to the issuance of a notice of deficiency.

If supervisory approval is to be required at all, it must be the case that the approval is obtained when the supervisor has the discretion to give or withhold it. [23] That discretion is lost once the Tax Court decision becomes final:

---

[23] The *Graev* court was divided over the import of the clause of § 6751(b) requiring written approval of the initial determination of assessment either by "the immediate supervisor of the individual making such determination" or by "such higher level official as the Secretary may designate." The dissent argued that, by using the present participle "making," as opposed to a past-tense verb form (e.g., "supervisor of the individual *who made* such determination"), the statute requires that the supervisory approval occur when "the individual [is] making such determination." *Id.* at *30 (Gustafson, J., dissenting) (alteration in original) (quoting § 6751(b)(1)). While we are inclined to disagree with that construction for much the same reasons as did the *Graev* majority, *see id.* at *11 & n.15, it matters not to our analysis. It is that supervisory approval is required at all that persuades us the dissent got it right.

at that point, § 6215(a) provides that "the entire amount redetermined as the deficiency . . . *shall* be assessed" (emphasis added). Thus, supervisory (or designated higher official) approval, in order to be of any consequence, must necessarily be obtained before the Tax Court's decision becomes final. After that point, the IRS loses discretion whether to assess the penalty. *See* I.R.C. § 6215(a).

It is not enough that approval be given before the Tax Court proceeding ends, however; for the supervisor's discretion to be given force, the approval must be issued before the Tax Court proceeding is even initiated. Section 6751 requires supervisory approval of "the *initial* determination of such assessment" (emphasis added). As the *Graev* dissent points out, the word "initial" is defined as "having to do with, indicating, or occurring at the beginning." Webster's New World College Dictionary 735 (4th ed. 2010); *see also* Black's Law Dictionary 460 (7th Ed. 1999) (offering as an example of the term "initial determination" the "first determination made by the Social Security Administration of a person's eligibility for benefits"). While the IRS might still have discretion to concede a penalty after a Tax Court proceeding has commenced, such determination would be final. The statute would make little sense if it permitted written approval of the "initial determination" up until and even contemporaneously with the IRS's final determination. In essence, the last moment the approval of the initial determination actually matters is immediately before the taxpayer files suit (or penalties are asserted in a Tax Court

proceeding).[24]  And for that matter, because a taxpayer can file a tax court petition at any time after receiving a notice of deficiency, the truly consequential moment of approval is the IRS's issuance of the notice of deficiency (or the filing of an answer or amended answer asserting penalties). Thus, we hold that § 6751(b)(1) requires written approval of the initial penalty determination no later than the date the IRS issues the notice of deficiency (or files an answer or amended answer) asserting such penalty.[25]

---

[24] We note that the Commissioner may, and often does, assert § 6662(a) penalties in answers or amended answers, and the Tax Court obtains jurisdiction pursuant to § 6214.  *See Graev*, 2016 WL 6996650, at *9 n.9.  Where the IRS moves for leave to assert penalties in an amended answer, the Tax Court considers the potential prejudice to the taxpayer of allowing the amendment. *See Estate of Quick v. Comm'r*, 110 T.C. 172, 180 (1998).

[25] The *Graev* majority and dissent argued at length about why the effective date of § 6751(b)(1) supports their respective positions. As originally enacted, the statute provided: "The amendments made by this section shall apply to notices issued, and penalties assessed, after December 31, 2000."  Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3306(c), 112 Stat. 685, 744.  The *Graev* majority read the effective-date provision to apply differently to subsections (a) and (b) of § 6751.  That is, that "notices issued" and "penalties issued" components correspond, respectively, to § 6751(a) (relating to the computation of penalty included in a "notice") and § 6751(b) (relating to approval of penalty "assessment"). Read that way, the effective-date provision, says the *Graev* majority, "clearly indicates that [§ 6751(b)] is focused on

In that vein, we further hold that compliance with § 6751(b) is part of the Commissioner's burden of production and proof in a deficiency case in which a penalty is asserted. As mentioned above, the Commissioner has the burden of production in any penalty proceeding. *See* I.R.C. § 7491(c) ("[T]he Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty . . . ."). Congress's intent is clear from the legislative history of § 7491(c):

> [I]n any court proceeding, the Secretary must initially come forward with evidence that it is appropriate to apply a particular penalty to the taxpayer before the court can impose the penalty. This provision is not intended to

---

assessment rather than on some earlier event." *Graev*, 2016 WL 6996650, at *13. The *Graev* dissent, by contrast, reads the effective-date provision to apply equally to both subsections of § 6751. The dissent sees "notices issued" to refer to penalties for which notices of deficiencies are required, and "penalties assessed" to refer to "assessable penalties" that do not require a "notice." *Id.* at *30-31 (Gustafson, J., dissenting).

While both sides present persuasive arguments and reasonable interpretations of the effective-date provision, we do not need to go to such lengths here. Even were we to credit the *Graev* majority's reading, we do not believe that this ambiguous provision overcomes the legislative history and requires the incongruous effects that flow from the majority's (and the Commissioner's) approach.

require the Secretary to introduce evidence of elements such as reasonable cause or substantial authority. Rather, the Secretary must come forward initially with evidence regarding the appropriateness of applying a particular penalty to the taxpayer; if the taxpayer believes that, because of reasonable cause, substantial authority, or a similar provision, it is inappropriate to impose the penalty, it is the taxpayer's responsibility (and not the Secretary's obligation) to raise those issues.

H. Rep. No. 105-599, at 241 (1998) (Conf. Rep.). It is incumbent on the Commissioner, in order to meet his burden of production, to "come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." *Higbee v. Comm'r*, 116 T.C. 438, 446 (2001). Because § 6751(b)(1) provides that "[n]o penalty . . . *shall* be assessed" (emphasis added) unless the written-approval requirement is satisfied, it would be inappropriate to impose a penalty where § 6751(b)(1) was not satisfied. Read in conjunction with § 7491(c), the written-approval requirement of § 6751(b)(1) is appropriately viewed as an element of a penalty claim, and therefore part of the IRS's *prima facie* penalty case.[26]

---

[26] The written-approval requirement—as a mandatory, statutory element of a penalty claim—is distinct from affirmative defenses based on "reasonable cause, substantial authority, or a similar

The only remaining issue is whether, in light of the foregoing, the Tax Court abused its discretion in declining to consider Chai's post-trial argument that the Commissioner had not met its burden of proof with respect to compliance with the written-approval requirement of § 6751(b)(1). Chai argues the Tax Court's timeliness ruling was wrong in three ways: (1) the issue of the Commissioner's failure to meet his burden could not have arisen until after he failed to do so; (2) the Commissioner had two separate opportunities after trial to supplement the record with evidence of compliance, but never did so, instead arguing that he was prejudiced by the timing of Chai's argument; and (3) because Chai raised the issue in his post-trial reply to the Commissioner's post-trial First Amendment to Answer, its untimeliness was cured by the Tax Court's "relation back" rule.

Given that § 6751(b)(1) written approval is an element of a penalty claim and therefore the Commissioner's burden to prove, Chai's post-trial argument was tantamount to a post-trial motion for judgment as a matter of law. In other words, Chai is essentially arguing that the evidence was legally insufficient to sustain the verdict on the penalty claim. Such challenges are properly (if not necessarily) made post-trial or at least after the party with the burden rests; the burdened party—here, the Commissioner—could not have failed to meet his burden until he concluded his

provision," which need be raised by the taxpayer. *See* H. Rep. No. 105-599, at 241.

68

presentation of evidence. In other words, as Chai explains, the sufficiency of the evidence "could not, by definition, become an issue until after the Commissioner failed to establish the elements of its penalty claim." Chai Br. 55.

In that sense, there was no timeliness issue and the Tax Court's decision was not, as the Commissioner argues, discretionary as to whether to consider the issue at all. Rather, the Tax Court should have applied the standard applicable to legal-sufficiency challenges, which is the same here as below: whether there was sufficient evidence to permit a rational juror to find in the Commissioner's favor. *See McCarthy v. N.Y.C. Tech. Coll. of City Univ. of N.Y.*, 202 F.3d 161, 167 (2d Cir. 2000). If the parties disagreed as to whether the written approval was an element of the Commissioner's penalty case, as they do here, they could have litigated that before the Tax Court at any point at which it was raised, including post-trial. The Tax Court then concluding one way or the other could resolve whether the evidence was sufficient to uphold the penalty.

Even more, it was not Chai's obligation to alert the Commissioner to the elements of his claim, and we fail to see how raising the issue post-trial denied the Commissioner the opportunity to properly rebut the argument. Indeed, as Chai notes, "the burden of production [i]s 'a party's *obligation to come forward* with evidence to support its claim.'" Chai Reply Br. 30 (quoting *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 272 (1994) (emphasis added)). The Commissioner and the Tax Court's approach would require a party to move to dismiss each element of a

69

claim before trial in order to preserve a sufficiency argument post-trial. That cannot be the case. Thus, the Tax Court was obligated to consider the issue of whether the Commissioner had met its burden.

In responding to Chai's argument that the Commissioner had multiple opportunities to supplement the record with evidence of compliance, the Commissioner acknowledges that it "is true but irrelevant." Comm'r Br. 75 (citing *Kaufman v. Comm'r*, 784 F.3d 56, 71 (1st Cir. 2015)). In *Kaufman*, the party challenging the Tax Court's penalty ruling raised the non-compliance issue for the first time on appeal. 784 F.3d at 71. The First Circuit deemed the argument unpreserved and rejected the Kaufmans' argument "that it was the IRS's burden to show that the requirements were met, and that the Commissioner cannot now enlarge the record to demonstrate compliance with section 6751." *Id.* (internal quotation marks omitted). The First Circuit stated that "the question whose burden it was to show compliance with § 6751 is beside the point," as "[t]he Kaufmans had the responsibility of *arguing* in the Tax Court that the Commissioner had not complied with the statute in order to put the Commissioner on notice that the issue was in dispute." *Id.* Having failed to make the argument below, the First Circuit held, "the Kaufmans cannot now fault the Commissioner for introducing no evidence to rebut it." *Id.* (citing *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)).

Here, by contrast, Chai did raise the written-approval issue below and the Tax Court gave the Commissioner an

opportunity to rebut it. The Tax Court should have considered the argument on its merits, as should we.

With respect to whether there was sufficient evidence of compliance with § 6751, the answer is clear: there was not. In fact, the Commissioner has never said that there was. Thus, the Commissioner has failed to meet his burden of proving compliance with § 6751, a prerequisite to assessment of the accuracy-related penalty. We therefore reverse the portion of the Tax Court's order upholding the penalty assessment.

## CONCLUSION

For the foregoing reasons, we hereby (1) **VACATE** the Tax Court's jurisdictional ruling and, because Chai concedes that the $2 million payment is fully taxable, **REMAND** the case to the Tax Court to enter a revised decision upholding the additional income-tax deficiency; (2) **AFFIRM** the portion of the Tax Court's order upholding the self-employment tax deficiency; and (3) **REVERSE** the portion of the Tax Court's order upholding the accuracy-related penalty.