T.C. Memo. 2018-181

UNITED STATES TAX COURT

SUGARLOAF FUND, LLC, JETSTREAM BUSINESS LIMITED, TAX
MATTERS PARTNER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 30410-12, 15857-13,      Filed October 29, 2018.
       15858-13,   165-14,
       28657-14.

John E. Rogers, for petitioners.

Craig Connell, Thomas A. Deamus, and Clare W. Darcy, for respondent.

_____

[1]Cases of the following petitioners are consolidated herewith: Sugarloaf
Fund, LLC, Warwick Trading, LLC, Butler Fund, LLC, Severus Fund, LLC, John
E. Rogers, Partners Other Than the Tax Matters Partner, Jetstream Business
Limited, Tax Matters Partner, docket No. 165-14; and Sugarloaf Fund, LLC,
Jetstream Business Limited, Tax Matters Partner, docket Nos. 15857-13, 15858-
13, and 28657-14.

[*2]          MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:[2]  Before us are five consolidated dockets, each of which

arises from a notice of final partnership administrative adjustment (FPAA) issued

to Sugarloaf Fund, LLC (Sugarloaf), for each year from 2006 through 2010.

However, the years 2009 and 2010 have been resolved by respondent's

concession.  The years 2006, 2007, and 2008 involve issues of whether Sugarloaf

should be recognized for tax purposes, who Sugarloaf's partners are and who is

taxed on its income, whether Sugarloaf revenue should be subject to self-

employment tax, whether various FPAA adjustments reducing expenses should be

sustained, and whether the penalty under section 6662(a)[3] should apply.

FINDINGS OF FACT

John E. Rogers is both Sugarloaf's representative and the promoter of the

transactions at issue.  Mr. Rogers has long been a party to litigation in this Court,

both as a promoter of tax shelters involving distressed debt and as a taxpayer

---

[2]These cases were assigned to Judge Robert A. Wherry, Jr., who retired from judicial service on January 1, 2018.  With the parties' agreement, the cases were reassigned to Judge Joseph R. Goeke for the purpose of rendering an opinion.

[3]Unless otherwise indicated all section references are to the Internal Revenue Code of 1986 as amended and in effect for the tax years at issue, and all Rule references are to the Tax Court Rule of Practice and Procedure.

[*3] himself. The present dockets arise from his role as a promoter. Mr. Rogers had complete control of Sugarloaf and the transactions at issue in these cases. He made all the operating decisions. At his direction, Sugarloaf engaged in distressed asset transactions such as those described in Kenna Trading, LLC v. Commissioner (Kenna Trading), 143 T.C. 322 (2014), and Derringer Trading, LLC v. Commissioner, T.C. Memo. 2018-59. In 2003 Mr. Rogers used Warwick Trading, LLC (Warwick), for the transactions, and he used Sugarloaf beginning in 2004. Mr. Rogers had Warwick and Sugarloaf use trading and holding companies treated as partnerships for Federal tax purposes for transactions during 2003 and 2004. He had Sugarloaf switch to transactions using trusts for 2005 through 2008.

The parties have extensively stipulated facts, including the entire record of trial in Kenna Trading. The stipulated facts are incorporated herein by this reference. For all relevant periods, including when the petitions were filed, the parties stipulated that Sugarloaf's place of business was in Illinois.

Mr. Rogers implemented and promoted the distressed debt transactions that give rise to respondent's adjustments through three business entities: (1) Portfolio Properties, Inc. (PPI), (2) Sugarloaf, and (3) Jetstream Business, Ltd. (Jetstream). Mr. Rogers organized PPI as its sole shareholder and caused it to elect S corporation status in 1992. He formed Sugarloaf and treated it as a partnership for

[*4] Federal income tax purposes. He formed Jetstream, a British Virgin Islands limited company, with PPI as its sole shareholder to act as Sugarloaf's sole manager and its tax matters partner. Jetstream is a disregarded entity for Federal tax purposes. Mr. Rogers was Jetstream's sole director and manager. Mr. Rogers controlled PPI, Jetstream, and Sugarloaf during the years at issue.

The present cases involve Mr. Rogers' treatment of investors in the distressed debt transactions he had previously structured. Nevertheless, neither Sugarloaf nor the various investors in the partnerships and trusts received any proceeds from the distressed debt through 2010. Mr. Rogers restructured the investments to "roll up" the investors in the distressed debt transactions into Sugarloaf so he could treat the rollup as transforming the investors into new partners in Sugarloaf. Sugarloaf is a party to these dockets primarily because of the rollup of the investors. The rollup transactions started in 2006 and ended in 2008. The first rollup occurred in January 2006 and involved all of the trading and holding companies used in the 2003 and 2004 transactions promoted through partnerships. Mr. Rogers structured the rollups so that the trading companies were treated as contributed to Sugarloaf and in return the holding companies became partners in Sugarloaf. In 2007 the subtrusts used in the 2005 transactions were contributed to Sugarloaf, and in return the trusts became partners in Sugarloaf.

**[*5]** Likewise, in 2008 the subtrusts used in the 2006 and 2007 transactions were contributed to Sugarloaf, and in return the 2006 and 2007 trusts became partners in Sugarloaf. Sugarloaf conducted business in the same manner both before and after the rollups. Mr. Rogers continued to sell the distressed debt transactions to new investors. Income, profit, or loss from the sale of the distressed debt transactions to new investors was not disbursed or allocated to the rolled-up investors.

The parties stipulated that neither the investors nor their representatives received prior notice of the rollups or consented to them in writing. There are no contracts showing what assets were rolled up or what interests the investors acquired in Sugarloaf; Mr. Rogers decided on his own what interest each investor acquired. Mr. Rogers did not reevaluate each investor's interest in making this determination. The investors were not asked to consent orally and were not notified of the rollups until after they had occurred. Mr. Rogers did not have authority under the terms of the trading companies' operating agreements or the trust agreements to make the transfers involving the rollups as the manager of Sugarloaf, the manager of the trading companies, or the trustee of the trusts.

With respect to the rollup of the investors from the 2003 and 2004 transactions, the operating agreements are identical except for the investors'

[*6] names and the amounts of the investments. Article VI of the trading companies' operating agreements for the 2003 Warwick transactions and the 2004 Sugarloaf transactions sets forth when and how a member may transfer his interest in the trading company. There is no provision in the operating agreements for anyone, other than a member, to transfer a member's interest. Article VI was not followed in transferring the ownership of the trading companies to Sugarloaf. As they were not aware of the transfers, the investors did not provide to the trading companies the amounts of capital to transfer to Sugarloaf. Moreover, Jetstream did not consent in writing to the transfers as required by the operating agreement. Article IV, section 4.1(a) of the operating agreements grants the manager the authority to manage and control the business, property, and affairs of the trading companies. It does not provide authority to transfer ownership. The operating agreements do not grant Mr. Rogers any authority, either implied or express, to transfer the investors' ownership of the trading companies without their consents.

With respect to the rollup of the trust investors from the 2005 and 2006 transactions, the trust agreements are identical in relevant part except for the investors' names and the amounts of the investments. Section 2.2(a) of the supplement to the trust agreements states that no interest in the subtrust may be transferred except as provided in section 2.2(b) and transfers not in compliance

**[*7]** with section 2.2(b) shall be considered null and void. Section 2.2(b) provides that interests in the subtrusts and the subtrusts' assets may be transferred only upon prior written notice by a beneficiary to the trustee. Mr. Rogers did not receive such written notices from the investors in the trust structures.

Before the years at issue Sugarloaf was owned by Jetstream. Beginning with 2006 Sugarloaf's return listed the rolled-up investors as partners. For 2006 to 2009 the rolled-up investors are listed as the holding companies and trusts. For 2010 the rolled-up investors are listed in their individual capacities. However, for each year from 2006 through 2010 the Schedules K-1 (Form 1065), Partner's Share of Income, Deductions, Credits, etc., list the holding companies' and trusts' employer identification numbers and not the investors' Social Security numbers.

In addition to the rolled-up investors, evidence of the owners of Sugarloaf is inconsistent. Jetstream and Warwick are listed on Sugarloaf's tax returns as partners for 2006 through 2010. In addition, four entities connected with Mr. Rogers' promotion of the distressed debt transactions, Globex, Teviot, Citgo, and Bernard Equity, were listed as Sugarloaf partners for some but not all the years at issue. Globex was a Brazilian retailer that contributed distressed debt to Sugarloaf in exchange for a partnership interest. The other three entities were connected with Mr. Mazzuchelli, who was involved in the operation of the tax shelter with

[*8] Mr. Rogers. Teviot and Bernard Equity were owned by Mr. Mazzuchelli and his father-in-law, respectively. Mr. Rogers did not know who owned Citgo but suspected that Mr. Mazzuchelli owned it. Sugarloaf's 2007 tax return shows Teviot, Citgo, and Bernard Equity as partners. The 2008 return shows the interests of the four entities as zero. Mr. Rogers eliminated the interests of Teviot, Citgo, and Bernard Equity because he believed that Mr. Mazzuchelli had cheated him. Petitioners presented no agreements indicating how Teviot and Bernard Equity became partners of Sugarloaf. There are no contribution agreements; nor are there any documents memorializing their interests in the profits, losses, and capital of Sugarloaf. Mr. Rogers offered no explanation for why Globex's interest was reduced to zero. Shelter promoter Michael Hartigan's clients were listed as partners for 2010, and petitioners' represented to the Court that Mr. Hartigan's clients were not partners for 2006 and 2007 despite earlier returns listing them as such.

With respect to Citgo, documentary evidence indicates that "Citco" purported to acquire 100,000 shares and/or units of Sugarloaf on January 6, 2006. However, Sugarloaf issued Schedules K-1 to Citgo only for 2007 and 2008. Sugarloaf's operating agreement does not state that it issued shares or units to its

[*9] members. Instead, capital accounts are maintained. Nothing in the record establishes the amount, if any, Citgo contributed to Sugarloaf for its interest.

During 2008 Sugarloaf received $1,876,000 in income from the sale of interests in Sugarloaf International and incurred $713,867 in cost of goods sold related to this income. Sugarloaf declared this income and, thus, allocated taxable income to the partners. However, there is no evidence that cash or some other economic benefit was ever distributed to the partners from these transactions.

As part of the distressed debt transactions, the investors deposited into the investor trust accounts $5,469,971, $2,614,597, and $375,555, for 2006, 2007, and 2008, respectively. In the FPAA respondent determined on the basis of the deposits that Sugarloaf had unreported income. The fees earned by promoters Mr. Hartigan, Mr. Greer, and Mr. Agresti and any other sellers of the shelter were paid separate and apart from the amounts deposited into the investor trust accounts. Sugarloaf did not collect these fees or disburse them to these individuals.

On its partnership tax returns for 2006 through 2008, Sugarloaf claimed business expense deductions that respondent disallowed in the FPAA and that remain in dispute. See Appendix infra p. 25. In the answer, petitioners asserted that Sugarloaf is entitled to increase its business expense deduction for legal and professional fees for 2006 by $1,207,000, for a total deduction of $1,382,000.

[*10] In the FPAAs respondent asserts accuracy-related penalties under section 6662(a) for 2006 through 2008. Prior written supervisory approval for imposing the penalties was obtained only for 2006 and 2007. The approval for 2008 was obtained four days after the FPAA was issued.

OPINION

Kenna Trading has a direct impact on the present cases. The record in Kenna Trading has been stipulated for inclusion in the records of these cases. Petitioners seek an interpretation of the record in Kenna Trading different from the one reached by the Court. Respondent maintains that the findings in Kenna Trading should form the foundation of our analysis of the present cases. Petitioners offer us no compelling basis to revisit the findings and legal analysis of Kenna Trading, and we adopt respondent's position.

In Kenna Trading, 143 T.C. at 328-329, we describe the origin of Sugarloaf as follows:

Mr. Rogers during or before 2003 conceived a plan that he contended would successfully invest in and manage distressed retail consumer receivables overseas and remit the proceeds to the United States. He used a tiered partnership structure in 2003 and most of 2004 and a tiered trust structure in 2005, 2006, and 2007 to sell interests to individual investors. Mr. Rogers contended the business would profit through aggressive collection efforts, translation gain from currency speculation, and a planned initial public offering. The first step under this plan was for Brazilian retailers to "contribute"

[*11] receivables to a limited liability entity controlled by Mr. Rogers, which, for U.S. tax purposes, would accede to the tax basis of the retailers in the consumer debt.

In 2003 he used a limited liability company called Warwick Trading, LLC, to purchase receivables from Lojas Arapua, S.A. (Arapua), a Brazilian retailer of household appliances and consumer electronics. In 2004 he used a different limited liability company, Sugarloaf, to which two other Brazilian retailers, Globex Utilidades, S.A. (Globex), and Companhia Brasileira de Distribuição (CBD), also "contributed" distressed accounts receivable for interests in that company. In 2004 Sugarloaf contributed a tranche of those assets to other limited liability companies (trading companies). Sugarloaf then contributed most or all of its interest in the trading companies to yet other limited liability companies (holding companies). In 2005 Sugarloaf "contributed" assets to trusts (main trusts), which each created another trust (subtrust). The main trust assigned the beneficial interests of the receivables in the subtrust to an investor who contributed money to the main trust. In both years Sugarloaf and the trading companies entered loan management and servicing agreements with a British Virgin Islands company called Multicred Investments Limited and/or a Brazilian company called Multicred Investimentos Limitada. * * *

Mr. Rogers formed Sugarloaf through entities he owned and controlled. He was the sole owner of an S corporation, Portfolio Properties, Inc. (PPI), which owned Jetstream, at that time a British Virgin Islands company. On April 17, 2003, Mr. Rogers, through Jetstream, formed Sugarloaf, a Delaware limited liability company. According to the operating agreement, Jetstream was the initial manager. On July 23, 2003, Mr. Rogers sent an engagement letter to Mr. Mazzucchelli as "Managing Member" of Sugarloaf by which Sugarloaf agreed to retain Seyfarth Shaw as its legal counsel. In August Mr. Rogers represented to Seyfarth Shaw that the owners of Sugarloaf were Mr. Mazzucchelli and Ms. Dowek. He never disclosed Jetstream's ownership, which was 100% at that time.

**[\*12]** I.     The Rollups

Mr. Rogers alleges that after 2005 he made a decision to "roll up" the distressed debt from the partnerships and trusts he had used to promote his tax shelter scheme into Sugarloaf with the alleged purpose of allocating ownership in Sugarloaf to the partners and trust beneficiaries and to sell the debt for the investors to recover portions of their investments.  Petitioners bear the burden to sustain these allegations; and to put it succinctly, the record lacks any coherent thread of evidence to support Mr. Rogers' assertion that a legally enforceable change in ownership occurred.  See Rule 142(a).  In addition, no economic consequence resulted from the alleged rollups as there was no recovery of distressed debt shared with alleged new owners of Sugarloaf.  Accordingly, we find there was no rollup for Federal tax purposes and the tax consequences to Sugarloaf in the years before us should be based on the ownerships described in Kenna Trading.

In Kenna Trading, 143 T.C. at 366-367, the Court found that all payments made by trust investors in 2005, whether paid to trust accounts or directly to Sugarloaf, constituted income to Sugarloaf, less fees retained by the promoters. The trust transactions for 2006 through 2008 were implemented in the same manner as they were for 2005.  Respondent asserts that the conclusion reached for

**[*13]** 2005 in <u>Kenna Trading</u> is required in the present case.  We agree as the record before us offers no supportable alternative.

II.     <u>A Viable Business</u>

In <u>Kenna Trading</u>, the Court found that Sugarloaf was not a partnership for the years 2004 and 2005 because Jetstream, Globex, and CBD/PDA did not intend to join together for purposes of carrying on a debt collection business.  <u>Id.</u> at 352.  We have previously stated that we will not recognize the alleged rollup of new owners.  Nothing of substance occurred in the years 2006 to 2008 to transform Sugarloaf into a partnership.  Sugarloaf was a sham in fact for 2006 to 2008.

Petitioners contend that in 2004 CBD/PDA and Globex contributed distressed debt to Sugarloaf in return for partnership interests.  We reject this argument as it was also rejected in <u>Kenna Trading</u>.  The Court found that under the disguised sale rules and the step transaction doctrine, CBD/PDA and Globex sold distressed debt to Sugarloaf in 2004.  <u>Id.</u> at 353-358.  Nothing presented in these cases changes that holding.  Sugarloaf did not acquire new debt in the years at issue, and the result reached in <u>Kenna Trading</u> controls here as well.  Petitioners contend that Sugarloaf had a business plan that could earn investors money.[4]

---

[4]Petitioners' contention that investors could earn money on the Sugarloaf transactions and that the distressed debt had significant value is also contradicted

(continued...)

**[\*14]** However the Court's conclusions in <u>Kenna Trading</u> are not based upon Sugarloaf's lacking a business plan. Instead, Sugarloaf was not a partnership, and the transactions Sugarloaf engaged in lacked substance.

### III. Sugarloaf's Income

Petitioners contend that Sugarloaf's taxable income should not be allocated to Mr. Rogers. However, this Court found that Jetstream was the sole owner of Sugarloaf during the years 2004 and 2005. Petitioners have not established there were any new owners of Sugarloaf during the years 2006 to 2008. The only owner remaining is Jetstream. Therefore, all of Sugarloaf's income should be allocated to Jetstream, and accordingly that income flows through to Mr. Rogers.

Petitioners assert that Jetstream was a subchapter C corporation and became a partner in Sugarloaf on September 23, 2008. However, Sugarloaf's tax returns for 2006 through 2010 show that Jetstream was a flowthrough entity. In the petitions and the amended petitions, petitioners did not raise the issue that a subchapter C corporation known as Jetstream became a partner in 2008 or that income should be allocated to that partner. In addition, the parties stipulated that Jetstream has not filed Forms 1120, U.S. Corporation Income Tax Return, for any

---

[4](...continued)
by respondent's experts, Dr. Finnerty, Mr. Hanan, and Mr. Tostes. Petitioners offered no evidence to rebut these reports.

[*15] of the 2008 through 2010 years, and petitioners have not proven that a subchapter C corporation known as Jetstream became a partner in Sugarloaf at any time in 2008; i.e., petitioners offered no contracts, records, or other documents showing that Jetstream, a subchapter C corporation, was admitted as a partner. In fact, Jetstream was originally organized in May 2002 as a limited company under the laws of the British Virgin Islands. In August 2002 Jetstream elected to be treated as a disregarded entity for tax purposes. While petitioners assert that Jetstream became a subchapter C corporation in September 2008, the Schedules K-1 attached to Sugarloaf's returns and the designation of Jetstream as tax matters partner on Sugarloaf's tax returns did not change. In conclusion, we hold that Sugarloaf was not a partnership for tax purposes during the years 2006 to 2008, and all of its income should be allocated to Jetstream.

The parties stipulated that as part of the distressed debt transactions, the investors deposited into the investor trust accounts $5,469,971, $2,614,597, and $375,555 during 2006, 2007, and 2008, respectively. Respondent argues these amounts (less amounts paid to Mr. Rogers and includible by him) are gross receipts to Sugarloaf, which Sugarloaf did not report, of $5,469,971, $2,206,597, and $375,555, for 2006, 2007, and 2008, respectively. In Kenna Trading, 143 T.C. at 367 & n.38, the Court stated:

**[\*16]** Second, and conclusively here, we found that in these 2005 transactions, the investors each purchased a tranche of receivables from Sugarloaf, making the money paid into the trust accounts income to Sugarloaf under section 1001. So, regardless of whether the 2005 investors' payments went into the trust accounts or directly to Sugarloaf, those amounts were still income to Sugarloaf.[38]

[38]We note that respondent has determined only that the six trust deposits actually deposited into Sugarloaf's bank account constitute income. Under our findings, all payments by the trust investors would constitute income to Sugarloaf, less fees retained by the promoters. We will not question respondent's magnanimity.

The distressed debt transactions for 2006 and 2007 were implemented in the same manner as they were in 2005, using the same structure, distressed debts acquired in 2004, deal documents, and trust bank accounts at Heritage Bank. Thus, in substance, the Brazilian retailers sold distressed assets to Sugarloaf in 2004, and Sugarloaf sold them to the investors in 2006 through 2008. These sales created taxable income to Sugarloaf, which in substance had control over the payments. Mr. Rogers agrees Sugarloaf did not report this income.

The fees earned by Mr. Hartigan, Mr. Greer, and Mr. Agresti and any other sellers of the shelter were paid separate and apart from the amounts deposited into the investor trust accounts. Respondent concedes that the amounts of Sugarloaf's unreported income for 2006 and 2007 are decreased by the amounts included in Mr. Rogers' income for those years. We have previously held that for 2006

[*17] $1,165,000 transferred from the trust accounts to Mr. Rogers was included in his income as compensation for his services as trustee. See Rogers v. Commissioner, T.C. Memo. 2018-53, at *35-*37. We also held that $465,000 that Sugarloaf paid to PPI during 2006 was included in PPI's 2006 gross income.[5] Id. at *14. For 2007 $408,000 was transferred to Mr. Rogers from the trust accounts as compensations for services, and he was required to report the $408,000 as income. These amounts should be subtracted from the Sugarloaf income as they are Mr. Rogers' income directly. The income in question is subject to self-employment tax under section 1401 because the income was earned through Mr. Rogers' activities.

IV.    The Deductions

Deductions are a matter of legislative grace and are allowed only as specifically provided by statute. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Generally, a taxpayer must establish that deductions claimed under section 162 are ordinary and necessary business expenses, and the taxpayer must maintain records to substantiate the deductions claimed. Sec. 6001; Meneguzzo v. Commissioner,

---

[5]In Rogers v. Commissioner, T.C. Memo. 2018-53, Mr. Rogers disputed the taxability of these transfers to himself for the year 2006. However, we found that $1,165,500 was taxable to him. Id. at *37.

**[*18]** 43 T.C. 824, 831-832 (1965); sec. 1.6001-1(a), (e), Income Tax Regs.

Claimed deductions in support of discredited tax shelter transactions are

nondeductible. Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 294

(1999), aff'd, 254 F.3d 1313 (11th Cir. 2001). In Kenna Trading, this Court held

that "expenditures made in an attempt to obtain abusive tax shelter benefits are not

ordinary and necessary business expenses or otherwise deductible under section

162(a)." Kenna Trading, 143 T.C. at 365 (quoting Gerdau Macsteel, Inc. v.

Commissioner, 139 T.C. 67, 182 (2012)). Further, the Court stated: "The

transactions in question were tax shelters, and Sugarloaf's claimed expenditures

were made in an attempt to obtain abusive tax shelter benefits." Id.

Respondent maintains that all the deductions in dispute should be

disallowed as supporting illicit tax shelter activities that lack economic substance.

See Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. at 294. While this

argument applies to some of the amounts in dispute, Sugarloaf's business was

actually to derive income from the investors in the spurious tax shelters. Although

Mr. Rogers maintains all the shelter investments were rolled up into Sugarloaf, we

have rejected that position earlier. Accordingly, we will analyze the disputed

deductions on the basis of what we find to be Sugarloaf's actual business,

siphoning money from the shelter investors.

**[*19]** The traditional attacks on loosely documented deductions are also made by respondent, and they are compelling here. Petitioners have generally failed to establish that the deducted expenses were actually incurred for the stated business purpose, were not previously deducted by another entity, or were actually expended in the first instance. We have here attempted to discern whether any of the deducted amounts were actually allowable on the basis of the jumbled record petitioners have offered. We disallow the disputed deductions except to the extent stated below.

For 2006 through 2008 Sugarloaf deducted business expenses as set forth in the Appendix. See infra p. 25. For 2006 petitioners contend that Sugarloaf is entitled to an additional deduction for legal fees of $1,207,000. Except as stated infra, petitioners have failed to establish the amounts or business purposes of disputed business expense deductions. For 2006 Sugarloaf is entitled to deduct legal expenses and accounting expenses of $175,000 and $22,000, respectively. For 2006 Sugarloaf is also entitled to deduct $100,000 in management fees paid to PPI. Petitioners adequately substantiated the amounts and business purpose of these expenses.

On the other hand, abandoned amortization, consulting fee, and other disallowed deductions are not established as having been incurred by Sugarloaf or

[*20] having been amortized by Sugarloaf in the first instance. For 2007 the deducted legal fees have not been established as being incurred for Sugarloaf's business, and the deducted travel expenses do not meet the strict substantiation requirements of section 274(d). For 2008 various deducted management fees totaling $375,000 are documented only by checks to PPI. Sugarloaf's business purpose for these checks is not proven, and they are not allowed as deductions. We find the consulting fees deducted for 2008, to the extent they are documented, were in furtherance of the tax shelter scheme to justify the spurious efforts to collect the distressed assets. Only $6,750 of the claimed amounts has been documented, but these amounts are not deductible for the reason stated. The amortization of startup costs deducted for 2008 is simply not substantiated.[6]

V.    Accuracy-Related Penalties

Respondent asserted accuracy-related penalties under section 6662(a) against Sugarloaf in the FPAAs issued for 2006, 2007, and 2008. Section 6751(b) provides:

> No penalty under this title shall be assessed unless the initial
> determination of such assessment is personally approved (in writing)

---

[6]We note respondent's reply brief has very carefully set forth the inconsistencies in the records offered for the Sugarloaf deductions, and those inconsistencies in themselves establish the lack of general credibility of the deductions sought.

[*21] by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.

We have recently held that challenges to accuracy-related penalties in partnership cases such as these may include the Commissioner's alleged noncompliance with the requirements of section 6751(b)(1). Endeavor Partners Fund v. Commissioner, T.C. Memo. 2018-96, at *63; see also Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 13-14) (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016). When a penalty is asserted, supervisory approval must be secured in writing before the initial determination. Sec. 6751(b); Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42. When the penalty is asserted in an FPAA, that approval must come before the notice is issued. Endeavor Partners Fund v. Commissioner, at *63; see also Chai v. Commissioner, 851 F.3d at 221.

With respect to penalties asserted against partnerships, the Commissioner has no burden of production, and the taxpayer must show that no penalty should apply. Sec. 7491(c); Dynamo Holdings v. Commissioner, 150 T.C. ___, ___ (slip op. at 16-17) (May 7, 2018); Endeavor Partners Fund v. Commissioner, at *64.

**[*22]** In these cases, written supervisory approval was sought and received for the penalties asserted in the 2006 and 2007 FPAAs before their issuance. However, the requisite supervisory approval for the penalties asserted in the 2008 FPAA was not obtained until four days <u>after</u> the FPAA was issued. "Section '6751(b)(1) requires written approval of [an] initial penalty determination no later than the date'" the Commissioner issues an FPAA. <u>Endeavor Partners Fund v. Commissioner</u>, at *65 (quoting <u>Chai v. Commissioner</u>, 851 F.3d at 221). Because the necessary approval for the 2008 FPAA penalty was not obtained until after the FPAA was issued, respondent failed to adhere to the statutory requirements and the 2008 penalty is not sustained.

Respondent has asserted that the section 6751(b) requirements were satisfied by his amending his answer and reasserting the penalties after supervisory approval was received. However, as we recently stated in <u>Endeavor Partners Fund v. Commissioner</u>, at *65, "[w]e are unable to accept this argument." Written approval must be obtained before the initial determination of a penalty. The initial determination of the 2008 penalty in this case was made before the penalty was asserted in the FPAA. The requisite approval was not obtained before the 2008 FPAA was issued and thus failed to satisfy the statutory requirements.

**[\*23]** Respondent urges that by rejecting his ability to cure a defective penalty assessment in an FPAA through an answer with this Court, we are creating a conflict between sections 6751(b) and 6226(f). Section 6751(b) requires the "initial determination" of a penalty to be approved by a supervisor in writing. Conversely, section 6226(f) allows this Court to determine the "applicability of any penalty * * * which relates to an adjustment to a partnership item."[7] We fail to see respondent's perceived conflict. These sections stand wholly on their own.

Respondent notes that the purpose of an answer is to place the court and the parties on notice of disputes. In respondent's view, that makes the answer an appropriate place to raise a section 6662 penalty. We find no issue with respondent's raising an accuracy-related penalty in his answer, particularly if such a penalty was previously included in an FPAA after supervisory approval. Respondent is even free to initially assert a section 6662(a) penalty in his answer if the requisite approval was obtained first. See Graev v. Commissioner, 149 T.C.

---

[7]In 2015 Congress passed the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(a), 129 stat. at 625, which repealed the previous TEFRA partnership audit rules, including sec. 6226. Act sec. 1101(c)(1), 129 stat. at 630, replaced sec. 6226 with an entirely new provision that is not applicable in the present cases. Our holding today should be limited to interpreting sec. 6226 as it existed before the amendment and has no applicability to the current rendition of sec. 6226. Because these cases concern the 2006 through 2010 tax years, prior sec. 6226 applies.

**[*24]** at \_\_\_ (slip op. at 12) (finding that section 6751(b)(1) was satisfied where the Commissioner "asserted for the first time" in his amendment to answer an accuracy-related penalty that had not been previously determined).

The word "initial" is key. In these cases, respondent's initial determination of an accuracy-related penalty was asserted in the 2008 FPAA issued to Sugarloaf before written supervisory approval had been obtained. Respondent cannot cure a defective initial determination with an approved subsequent determination; there can be only one initial determination of a penalty, and that determination must be timely approved, in writing, by a supervisor. Failure to obtain timely approval for an initial determination renders it defective and is fatal to respondent's ability to assert the 2008 penalty now. Because the requisite timely supervisory approval was obtained for the 2006 and 2007 penalties, they are sustained.

The Court has considered all of the parties' arguments and, to the extent not discussed above, concludes that those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.

[*25]                          APPENDIX

| Expense | 2006 | 2007 | 2008 |
|---|---|---|---|
| Accounting fees | $22,000 | $116,025 | $16,257 |
| Amortization | 400 | 16,000 | 169,800 |
| Abandonment amortization | -0- | -0- | 433,200 |
| Bank service charges | 656 | 614 | -0- |
| Licenses and fees | 575 | -0- | -0- |
| Collection expense | -0- | 200,456 | -0- |
| Commissions | -0- | | 16,667 |
| Consulting fees | 327,486 | -0- | 360,726 |
| Filing fees | 696 | 6,173 | 17,451 |
| Legal and professional fees | 175,000 | 200,000 | 451,199 |
| Management and director | 100,000 | 400,000 | 375,000 |
| Office expense | 240 | -0- | -0- |
| Rent | -0- | -0- | 40,000 |
| Professional fees | -0- | 12,533 | -0- |
| Telephone | -0- | | -0- |
| Travel expenses | 525 | 37,604 | -0- |